## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

CATHOLIC CHARITIES OF
JACKSON, LENAWEE AND
HILLSDALE COUNTIES and
EMILY MCJONES,

     *Plaintiffs*,

  v.

GRETCHEN WHITMER, in her official
capacity as Governor of Michigan;

DANA NESSEL, in her official capacity
as Attorney General of Michigan;

MARLON BROWN, in his official
capacity as director of the Michigan
Department of Licensing and
Regulatory Affairs;

AMY GUMBRECHT, in her official
capacity as Director of the Bureau of
Professional Licensing in the Michigan
Department of Licensing and
Regulatory Affairs;

ELIZABETH HERTEL, in her official
capacity as director of the Michigan
Department of Health and Human
Services;

NAPOLEON HARRINGTON, SHERI
PICKOVER, LESLEY ADDISON,
LAURA MAMMEN, ROBIN CHOSA,
MARY BILLMAN, WALTER HARPER,
CHARLES HUGHES, JANET GLAES,
ROTESA BAKER, ROBERTO
OVERTON, COURTENAY MORSI, in
their official capacities as members of
the Michigan Board of Counseling;

Civil No. _____

**COMPLAINT**

**PERMANENT INJUNCTIVE
RELIEF REQUESTED**

**DECLARATORY RELIEF
REQUESTED**

**JURY TRIAL DEMANDED**

JULIAN DIAZ, DANIELLE HOOVER,
JANET JOINER, MARIA PETRIDES,
PETRA ALSOOFY, MAXINE THOME,
VICTOR WEIPERT, ROCHELLE
VRSEK, and CHINA SELLS, in their
official capacities as members of the
Michigan Board of Social Workers; and

LATRICIA POWELL, JOHN RANDLE,
GARY HARPER, FRANCES BROWN,
CHARMEKA NEWTON, HARPER
WEST, MELISSA GREY, BRANDELL
ADAMS, and COURTENAY MORSI, in
their official capacities as members of
the Michigan Board of Psychology,

*Defendants.*

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

JURISDICTION AND VENUE .............................................................................. 3

PARTIES .................................................................................................................... 3

FACTUAL ALLEGATIONS ................................................................................... 6

  I. Plaintiffs' Speech ............................................................................................. 6

    A. Plaintiff Catholic Charities .................................................................... 6

    B. Plaintiff Emily McJones ......................................................................... 7

    C. Plaintiffs' Talk Therapy ......................................................................... 8

    D. Talk Therapy Relating to Gender Identity and Sexuality ............ 10

    E. Current Evidence Relating to Gender Identity and Sexuality ..... 12

  II. Defendants' Speech Restrictions ............................................................ 14

    A. Defendants' Regulation of Counseling ........................................... 14

    B. Michigan's Enactment of HB 4616 ................................................... 15

    C. Defendants' Enforcement of HB 4616 ............................................. 17

  III. Effects of Defendants' Speech Restrictions ....................................... 19

    A. Effect of HB 4616 on Plaintiffs ......................................................... 19

    B. Effect of HB 4616 on Plaintiffs' Clients ......................................... 21

CLAIMS FOR RELIEF ......................................................................................... 22

  Count I:    First Amendment Freedom of Speech:
               Content and Viewpoint Discrimination ...................................... 22

  Count II:   First Amendment Freedom of Speech:
               Unreasonable Restriction ............................................................... 24

  Count III:  First Amendment Freedom of Speech:
               Right to Receive Information .......................................................... 25

  Count IV:  First Amendment Free Exercise of Religion:
               Not Neutral or Generally Applicable ........................................... 26

  Count V:   First Amendment Free Exercise of Religion:
               Right to Direct the Religious Upbringing of Children ............ 27

  Count VI:  Fourteenth Amendment Due Process:
               Void for Vagueness ........................................................................... 28

JURY DEMAND ..................................................................................................... 29

PRAYER FOR RELIEF ......................................................................................... 29

**INTRODUCTION**

1.    This is a lawsuit about helping children who experience distress over their biological sex.

2.    In recent years, there has been a spike in the number of children identifying as transgender. Many of these children, when they have sought professional help, have been encouraged to undergo a gender transition. That means they first "socially transition" by adopting a new name and pronouns and presenting themselves socially as someone of the opposite sex. Then they "medically transition" by receiving puberty blocking drugs, cross-sex hormones, and surgeries to make their bodies look more like the opposite sex.

3.    Unfortunately, there is no sound evidence that such medical interventions provide any long-term benefits. And there is mounting evidence that they impose lasting harms. For example, cross-sex hormones increase the risk of harms like erythrocytosis, myocardial infarction, liver dysfunction, coronary artery disease, cerebrovascular disease, hypertension, cancer, and sexual dysfunction. And a full medical transition renders an individual permanently sterile—never able to have children of their own.

4.    Because of these harms, twenty-five states and several European countries have recently restricted gender transitions for children. Relying on the latest scientific and medical research, they have instead recommended that children receive counseling to help them understand and address the underlying causes of their distress. Transgender individuals, too, have come forward, expressing profound grief at how hasty medical transitions have harmed them, and expressing the view that what they really needed was not to be affirmed in a gender transition, but to receive compassionate counseling to help them uncover the causes of their distress and to embrace their biological sex.

1

5. The Plaintiffs in this lawsuit are compassionate, professional counselors who help clients address a wide variety of life issues via the time-tested method of "talk therapy"—that is, by listening to clients, asking them questions, and talking with them about their lives. By engaging in thoughtful conversation, Plaintiffs have helped numerous individuals address a wide variety of life issues and accomplish their own unique goals.

6. Among the many issues Plaintiffs have helped clients address are issues of gender identity and sexuality. For example, Plaintiffs have had clients as young as 10 to 12 years old who said they were questioning their gender identity and felt like they were someone of the opposite sex. As with any other issue, Plaintiffs gently help these clients explore why they feel this way. By helping clients address underlying trauma and heal from past experiences, Plaintiffs have helped clients change their behavior and gender expression in ways that better align with the clients' own unique goals for their lives—including by accepting and embracing their biological sex.

7. The state of Michigan, however, has recently made such counseling illegal. HB 4616 prohibits counselors from offering minors what the state calls "conversion therapy," broadly defined as "any practice," including pure speech, that seeks to "change" an individual's "gender identity," "behavior," or "gender expression"—including to help an individual align her behavior or gender expression with her biological sex. In fact, HB 4616 goes out of its way to say that "counseling that provides assistance to an individual undergoing a gender transition" is permitted, while counseling that helps an individual accept her biological sex is not.

8. This attempt to control counselors' speech violates several constitutional protections. It violates the Free Speech Clause because it regulates speech based on its content and viewpoint and cannot satisfy strict scrutiny. It violates the Due Process Clause because it employs vague, undefined terms that invite arbitrary and selective enforcement. And it violates the Free Exercise Clause because it targets religious

2

speech and interferes with the right of parents to direct the religious upbringing of their children.

9.   Worse, HB 4616 harms vulnerable children by depriving them of the compassionate counseling they so desperately need. Instead of allowing counselors to help children explore the underlying factors that may be contributing to their distress, and to help them accept and embrace their biological sex, HB 4616 forces counselors to "affirm" children in the belief that they were born in the wrong body and help them undergo permanent, life-altering medical procedures that many will come to regret. This not only contradicts a mounting body of scientific evidence that supports a more cautious approach; it also violates the Constitution. Other courts have enjoined identical laws in other jurisdictions. *Otto v. City of Boca Raton, Fla.*, 981 F.3d 854, 872 (11th Cir. 2020). This Court should do the same.

## JURISDICTION AND VENUE

10.   This civil rights action pursuant to 42 U.S.C. § 1983 raises federal questions under the United States Constitution, particularly the First and Fourteenth Amendments.

11.   This Court has original jurisdiction under 28 U.S.C. §§ 1331 and 1343.

12.   This Court has authority to award the requested declaratory relief under 28 U.S.C. §§ 2201-02 and Federal Rule of Civil Procedure 57; the requested injunctive relief under 28 U.S.C. § 1343 and Federal Rule of Civil Procedure 65; and costs and attorney's fees under 42 U.S.C. § 1988.

13.   Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District and the Defendants are located in relevant part in this District.

## PARTIES

14.   Catholic Charities of Jackson, Lenawee and Hillsdale Counties ("Catholic Charities") is a Michigan nonprofit organization that carries out the work of the

3

Roman Catholic Church by sharing the love of Christ and performing corporal and spiritual works of mercy. As part of that mission, it provides individual, family, and marital therapy via masters-level therapists.

15.    Emily McJones, MA, LLP, is a licensed therapist who operates in Lansing, Michigan. She started her own practice, Little Flower Counseling, in 2020 and provides evidenced-based treatments from a perspective that is faithful to the teachings of the Catholic Church, while loving and caring for each client.

16.    Gretchen Whitmer is the Governor of Michigan and ultimately responsible for the enforcement of Michigan law. Per Michigan's Constitution, the executive power of the state is vested in the governor and the governor shall take care that applicable federal and state laws are faithfully executed. Mich. Const. art. 5, §§ 1, 8.

17.    Dana Nessel is the Attorney General of Michigan and has the authority to enforce and prosecute violations of the Public Health Code. *See* MCL 333.16291.

18.    Marlon Brown is the Director of the Michigan Department of Licensing and Regulatory Affairs (LARA). LARA is charged with taking disciplinary action and issuing licensing sanctions in case of a violation of HB 4616. *See* MCL 330.1901a; 333.16221, and 333.16226.

19.    Amy Gumbrecht is the Director of LARA's Bureau of Professional Licensing (BPL). BPL is charged with taking disciplinary action and issuing licensing sanctions in case of a violation of HB 4616. *See* MCL 330.1901a; 333.16221, and 333.16226.

20.    Elizabeth Hertel is the Director of the Michigan Department of Health and Human Services ("MDHHS"). Per MCL 330.1273(3), Michigan's Mental Health Code, MDHHS may "make inspections necessary to enforce this chapter and rules promulgated under" the Mental Health Code.

21.    Napoleon Harrington, Sheri Pickover, Lesley Addison, Laura Mammen, Robin Chosa, Mary Billman, Walter Harper, Charles Hughes, Janet Glaes, Rotesa Baker, and Roberto Overton are members of the Michigan Board of Counseling. The

Board of Counseling is an administrative agency established by the Public Health Code, MCL 333.1101 *et seq.*, and is empowered to discipline counseling licensees under the Code. The Board is therefore responsible for disciplining licensees that violate HB 4616. *See* MCL 333.16226; 333.18103.

22. Julian Diaz, Danielle Hoover, Janet Joiner, Maria Petrides, Petra Alsoofy, Maxine Thome, Victor Weipert, Rochelle Vrsek, and China Sells are members of the Michigan Board of Social Workers. The Board of Social Workers is an administrative agency established by the Public Health Code, MCL 333.18505 *et seq.*, and is empowered to discipline social worker licensees under the Code. The Board is therefore responsible for disciplining licensees that violate HB 4616. *See* MCL 333.16226; 333.16104.

23. Latricia Powell, John Randle, Gary Harper, Frances Brown, Charmeka Newton, Harper West, Melissa Grey, Brandell Adams, and Courtenay Morsi are members of the Michigan Board of Psychology. The Board of Psychology is an administrative agency established by the Public Health Code, MCL 333.18221 *et seq.*, and is empowered to discipline psychology licensees under the Code. The Board is therefore responsible for disciplining licensees that violate HB 4616. *See* MCL 333.16226; 333.16104.

24. All Defendants are sued in their official capacities. The Governor, the Attorney General, the Director of the Michigan Department of Licensing and Regulatory Affairs, the Director of LARA's Bureau of Professional Licensing, the Director of the Michigan Department of Health and Human Services, and all Board Members listed above are "person[s]" under 42 U.S.C. § 1983 for purposes of injunctive relief, and are sued pursuant to *Ex parte Young*, 209 U.S. 123 (1908).

## FACTUAL ALLEGATIONS

### I.      Plaintiffs' Speech

#### A. *Plaintiff Catholic Charities*

25.    Catholic Charities of Jackson, Lenawee and Hillsdale Counties is a religious organization and a ministry of the Diocese of Lansing. It serves the residents of Jackson, Lenawee, and Hillsdale Counties.

26.    Catholic Charities' mission is to share the love of Christ by performing corporal and spiritual works of mercy.

27.    Catholic Charities carries out Christ's commandment to love its neighbors by providing help and creating hope for individuals and families who come to them for support. Catholic Charities welcomes everyone with open arms and open hearts and provides an array of human services, regardless of faith or ability to pay.

28.    One way that Catholic Charities fulfills its religious mission is by employing masters-level counselors to provide counseling and therapy to individuals and families in need. Catholic Charities' counseling ministry is carried out by counselors with professional degrees that include LMSW, LLMSW, LPC, LLPC, or LLP, and who are subject to disciplinary oversight by Defendants.

29.    Catholic Charities' counselors provide top-quality care for all clients, using evidence-based practices tailored to each client's needs.

30.    Catholic Charities' counselors provide counseling on a vast array of issues that arise in personal, marriage, and family life.

31.    Catholic Charities provides counseling services in a manner consistent with its Catholic beliefs. This includes following Catholic teaching on human sexuality and gender identity.

32.    Catholic Charities strives to respect the biological sex of the human person as given by God and believes that marriage is a lifelong commitment between one

6

man and one woman and that the deliberate use of the sexual faculty, for whatever reason, outside of marriage is essentially contrary to its purpose.

33. All Catholic Charities' counselors agree to hold a Christian anthropology of the human person and to understand and adhere to Catholic teaching.

34. Catholic Charities offers counseling services to all, regardless of age, faith, sexual orientation, gender identity, or other individual characteristics.

35. Catholic Charities' counseling involves talk therapy only.

36. Some clients seek Catholic Charities' services in part because they desire a counselor who understands and respects their religious beliefs.

37. Often, Catholic Charities' clients express the belief that alignment between their actions and feelings on the one hand, and their religious convictions on the other, is important to help them pursue their personal goals.

### B. Plaintiff Emily McJones

38. Emily McJones is a devout Catholic and licensed counselor practicing in Lansing, Michigan.

39. Emily graduated with honors from Moody Theological Seminary and Graduate School in 2013 with a Master of Arts in Counseling Psychology.

40. Over the years, she has worked as an in-home therapist for clients with autism and as an outpatient mental health therapist in both public community settings and private, Christian, non-profit settings.

41. Emily has worked as a Child & Adolescent Crisis Services therapist. In that role, Emily received advanced training in the most effective forms of therapy for suicidal youth. Emily spent 3 years helping persistently suicidal youth, including transgender youth.

42. In 2020, Emily started her own counseling practice named Little Flower Counseling. Little Flower Counseling is named after St. Thérèse of Lisieux, also known as the Little Flower.

43.   Emily's Catholic faith informs her counseling practices. She believes that there is a tendency in counseling to err in one of two directions: therapists are either so focused on providing evidence-based treatment that they neglect the impact of spiritual matters in a client's mental and emotional health, or they are so focused on the spiritual that they neglect the good, sound interventions which have come from decades of psychological research.

44.   At Little Flower Counseling, Emily integrates evidence-based psychotherapy techniques with the truth that comes from Jesus Christ and his Church. She likes to say that she thinks psychologically about theology and theologically about psychology.

45.   Emily holds Catholic religious beliefs about human sexuality and gender identity. Emily strives to respect the biological sex of the human person as given by God and believes that marriage is a lifelong commitment between one man and one woman and that the deliberate use of the sexual faculty, for whatever reason, outside of marriage is essentially contrary to its purpose.

46.   Emily offers her counseling services to all, regardless of age, faith, sexual orientation, gender identity, or other individual characteristics.

47.   Emily's counseling involves talk therapy only.

48.   Some clients seek Emily's help in part because they desire a counselor who shares and so will understand and respect their religious beliefs. Often, Emily's clients express the belief that alignment between their actions and feelings on the one hand, and their religious convictions on the other, will be important to help them pursue their personal goals.

### C. Plaintiffs' Talk Therapy

49.   Plaintiffs provide talk therapy, also known as psychotherapy, to their clients. In talk therapy, a client talks with a counselor to address mental health issues, learn how thoughts, emotions, and behaviors can affect moods, and learn how to respond

to challenging situations with healthy coping skills. *See Psychotherapy*, Mayo Clinic (Apr. 11, 2023) https://perma.cc/4S5L-BGTA.

50.   Talk therapy is a popular and versatile treatment that can help clients address troubling emotions, thoughts, or behaviors.

51.   Plaintiffs provide talk therapy to help clients with a variety of concerns, including those related to family life, relationships, marriage, vocation, and many other matters.

52.   Before a client begins counseling services with Plaintiffs, Plaintiffs share their approach to counseling with the client, and give the client space to describe why they are seeking counseling services. This allows Plaintiffs to determine whether they can provide services that meet the client's needs and see whether Plaintiffs and the client are a good fit.

53.   Plaintiffs obtain informed consent before beginning counseling services so the client understands both the scope and the goal of their services.

54.   When counseling minors, Plaintiffs obtain informed consent from both the child and their parents. Plaintiffs inform minor clients that they will respect the clients' privacy, but if there are any concerns about abuse or dangerous situations, Plaintiffs may have to inform parents or others to ensure the child's safety.

55.   Plaintiffs' approach to counseling is client driven. This means clients, not Plaintiffs, determine the goals for counseling.  A client's goals in counseling may be specific (e.g., discuss specific trauma) or general (e.g., explore familial relationships).

56.   Client-counselor relationships rely heavily on trust. Confidentiality rules preclude counselors from sharing their clients' information except in very limited circumstances. Even so, it often takes several sessions before a client is comfortable with a counselor and able to address their goals in a more meaningful way.

9

57.    Often, as talk therapy proceeds, clients uncover thought patterns, beliefs, memories, or other characteristics that cause them to shift their goals. Plaintiffs therefore often check in regarding the client's goals.

58.    Plaintiffs typically meet with their clients regularly, usually weekly or bi-weekly, and sessions typically last about an hour.

59.    Emily begins each session with a prayer, if the client desires, and then asks what the client would like to discuss or work on during that session. The counseling conversation proceeds from there.

60.    As with the content of counseling services, the length of services is set by the client. Clients determine when they have met their goals or wish to otherwise termi-nate the counseling relationship. Clients are free to discontinue services at any time.

61.    In Plaintiffs' experience, the length of client-counselor relationships varies. Some clients may seek counseling for a few weeks or months, while other clients have been seeing Plaintiffs for years.

62.    In Plaintiffs' experience, clients' goals vary widely. Many clients seek to ex-plore various relationships, heal from past experiences or trauma, accept personal traits or characteristics, change patterns of thinking and mindsets, or grow in recog-nizing and expressing emotion.

63.    At all times, Plaintiffs engage in client-centered therapy that seeks to help clients accomplish their goals and build integrated, whole lives.

### D. Talk Therapy Relating to Gender Identity and Sexuality

64.    Some clients, including children and teenagers, have sought Plaintiffs' coun-seling on issues related to gender identity or sexual orientation. Sometimes clients have sought out Plaintiffs specifically for help with these issues.

65.    For example, clients may seek to become more comfortable with their biolog-ical sex and thus decrease the dissonance between their gender identity and biological

10

sex. Clients may also seek to reduce sexual activity with members of the same sex or align their sexual orientation identity with their religious beliefs.

66. When these issues arise, Plaintiffs follow the same client-driven approach to counseling as on any other issue—talking with clients to help them understand and address emotions, thought patterns, and behaviors that are preventing clients from accomplishing their goals and living the lives they want to live.

67. Plaintiffs have had clients as young as 10 to 12 years old who said they were questioning their gender identity and said they felt like they were someone of the opposite sex or were attracted to people of the same sex.

68. As with other life issues, Plaintiffs gently help these clients explore why they feel this way. Plaintiffs have found that children sometimes express discomfort with their biological sex due to prior trauma or other life events. In these situations, Plaintiffs have counseled clients to delay major life changes, like identifying as someone of the opposite sex or entering into sexual relationships, because they were quite young and still figuring out who they were. This has allowed Plaintiffs' clients time and space to figure out who they are and explore other issues that might be contributing to their distress.

69. Plaintiffs believe that that when a client comes to them and seeks to change her gender identity or gender expression to align with her biological sex, or seeks to change her behavior to refrain from acting on same-sex attraction, it is their ethical and religious duty to help that client live the life she desires to live.

70. By helping clients address underlying trauma and heal from past experiences, Plaintiffs have often seen clients change their behavior and gender expression in ways that better align with the clients' own religious beliefs and the clients' own goals for their lives—including by accepting and embracing their biological sex and by refraining from sexual activity outside of male-female marriage.

11

71.   Out of respect for their clients and their autonomy, Plaintiffs plan to keep providing the kind of therapy that helps their clients accomplish their goals.

### E. Current Evidence Relating to Gender Identity and Sexuality

72.   Plaintiffs' practice in this regard aligns with what has long been the standard approach to counseling minors who experience gender dysphoria—and aligns with the best and most current medical evidence.

73.   Under this approach, which can be called the "cautious approach," a counselor recognizes that a young person's experience of gender dysphoria is complex, can be impacted by past experiences and co-occurring mental health conditions, and can change over time. A cautious therapist will therefore seek to help a young person explore the underlying causes of her distress and alleviate that distress, if possible, by helping the young person accept and embrace her body without resorting to medical or surgical intervention.

74.   In contrast with this approach, some medical and advocacy groups endorse what can be called the "gender-affirming" approach. Under this approach, a counselor presumes that children who assert a transgender identity know their gender definitively. Thus, the role of the counselor under this approach is to "follow the child's lead"—by reassuring the child there is nothing wrong with the child's gender identity or expression, by affirming the child's social transition, and by supporting the child in a medical transition via puberty-blocking drugs, cross-sex hormones, and surgeries.

75.   The benefits and risks of these competing approaches are currently the subject of vigorous national and international debate. However, the most robust and current scientific evidence favors the cautious approach.

76.   There is currently no reliable evidence that social and medical transition helps children with gender dysphoria manage their distress over the long term. The most comprehensive review of the evidence to date, commissioned by England's

National Health Service, concluded: "This is an area of remarkably weak evidence, and yet results of studies are exaggerated or misrepresented by people on all sides of the debate to support their viewpoint. The reality is that we have no good evidence on the long-term outcomes of interventions to manage gender-related distress." *The Cass Review* at 13, Independent Review of Gender Identity Services for Children and Young People (Apr. 2024), https://perma.cc/J5GN-ELUY ("Cass Review").

77. By contrast, there is abundant evidence that medical transition causes significant, lasting health harms—such as permanent sterilization, sexual dysfunction, and loss of bone density; increased risk for girls of erythrocytosis, myocardial infarction, liver dysfunction, coronary artery disease, cerebrovascular disease, hypertension, and breast and uterine cancer; and increased risk for boys of macroprolactinoma, coronary artery disease, cerebrovascular disease, cholelithiasis, and hypertriglyceridemia.

78. At the same time, studies consistently show that the vast majority (up to 80-95%) of children diagnosed with gender dysphoria naturally grow out of it after passing through puberty.

79. Thus, the long-term, adverse health effects of a medical transition are significant and highly likely to occur; the supposed benefits are speculative and unsupported by reliable evidence. Meanwhile, most children diagnosed with gender dysphoria grow out of it naturally if permitted to pass through puberty without medical intervention—meaning the medical interventions and attendant harms are unnecessary to begin with.

80. For this reason, in recent years, twenty-five states have banned or severely restricted medical transitions for minors. *See L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 468 (6th Cir.), *cert. granted sub nom. United States v. Skrmetti*, No. 23-477, 2024 WL 3089532 (U.S. June 24, 2024) (upholding Kentucky and Tennessee restrictions).

13

81. Similarly, multiple European countries have restricted medical transitions for minors—including the United Kingdom, Sweden, Finland, Denmark, and Norway.

82. Many of these jurisdictions have instead recommended that the first-line intervention for gender dysphoria in minors be counseling to help them explore the underlying causes of their distress.

## II. Defendants' Speech Restrictions

83. Michigan recently amended state law to prohibit Plaintiffs' cautious counseling approach.

### A. Defendants' Regulation of Counseling

84. Michigan regulates the provision of counseling services through its Public Health Code, Act 368 of 1978, at MCL 333.1101 *et seq.*, Mental Health Code, Act 258 of 1974, and its Administrative Code for Licensing and Regulatory Affairs – Bureau of Professional Licensing, R 338.1 *et seq.*

85. The Public Health Code regulates licensing and educational requirements for professionals in Michigan, including mental health professionals like counselors, psychologists, social workers, marriage and family therapists, and behavior analysts. The Public Health Code also creates various boards that govern professional licenses.

86. Code sections MCL 333.18101-18117 govern counseling. The code defines "counseling"; creates the Michigan Board of Counseling; and states broadly that a licensee cannot "perform any acts, tasks, or functions within the practice of counseling unless he or she is trained" to do so. *See* MCL 333.18105. The code also lays out educational and supervisory requirements for various counseling licenses and describes how counselors may hold themselves out professionally. The code outlines similar guidance for marriage and family therapists, MCL 333.16901-16915; social workers, MCL 333.18511; and psychologists, MCL 333.18201-8237.

87. Michigan's administrative code implements the licensing and educational requirements specified in the Public Health Code. R 338.1751-1781 (counselors); R

333.18501-33318518 (social workers); R 338.7201-7219 (marriage and family therapists); R 333.2521-338.2585 (psychologists).

88. The Mental Health Code is the compilation of Michigan laws governing the delivery of mental health services. Like the Public Health Code, the Mental Health Code broadly prohibits mental health professionals from "perform[ing] an act, task, or function within the field of mental illness or developmental disability unless he or she has been trained" to do so or is supervised. MCL 330.1901.

89. Michigan does not typically regulate the content of counseling conversations. Except for HB 4616, described below, neither the Mental Health Code nor the Public Health Code regulates specific types of psychology, therapy, or counseling practices that licensed professionals may engage in.

### B. Michigan's Enactment of HB 4616

90. On July 26, 2023, Governor Whitmer signed into law two new bills amending the Mental Health Code: House Bills 4616 and 4617. These laws took effect on February 13, 2024.

91. HB 4616, codified at 1974 Pub. Act 258, MCL 330.1901a, provides: "A mental health professional shall not engage in conversion therapy with a minor."

92. HB 4617, codified at 1974 Pub. Act 258, MCL 330.1100a(20), defines "conversion therapy" as follows:

> "Conversion therapy" means any practice or treatment by a mental health professional that seeks to change an individual's sexual orientation or gender identity, including, but not limited to, efforts to change behavior or gender expression or to reduce or eliminate sexual or romantic attractions or feelings toward an individual of the same gender.

93. HB 4617 also excludes some counseling from the definition of "conversion therapy":

> Conversion therapy does not include counseling that provides assistance to an individual undergoing a gender transition, counseling that

15

> provides acceptance, support, or understanding of an individual or fa-
> cilitates an individual's coping, social support, or identity exploration
> and development, including sexual orientation-neutral intervention to
> prevent or address unlawful conduct or unsafe sexual practices, as
> long as the counseling does not seek to change an individual's sexual
> orientation or gender identity.

1974 Pub. Act 258, MCL 330.1100a(20).

94.  For the sake of simplicity, this Complaint refers to HB 4616 and 4617 collectively as "HB 4616."

95.  For purposes of HB 4616, "gender identity" means "having or being perceived as having a gender-related self-identity or expression whether or not associated with an individual's assigned sex at birth," and "sexual orientation" means "having an orientation for heterosexuality, homosexuality, or bisexuality or having a history of such an orientation or being identified with such an orientation." MCL 37.2103(f), (l).

96.  For purposes of HB 4616, a "mental health professional" is defined as a physician, psychologist, registered professional nurse, licensed master's social worker, licensed professional counselor, or licensed marriage and family therapist "who is trained and experienced in the area of mental illness or developmental disabilities." MCL 330.1100b(19).

97.  Plaintiffs are mental health professionals within the statutory definition because they are or employ individuals licensed in social work, psychology, and counseling.

98.  HB 4616 facially regulates the content of counseling conversations.

99.  Under HB 4616, if a counseling conversation seeks to help a client "change behavior" to align the client's "gender expression" with the client's biological sex, that conversation is unlawful.

100. But if a counseling conversation "provides assistance," "acceptance, or "support" to "an individual undergoing a gender transition," it is permitted.

101. Similarly, under HB 4616, if a counseling conversation seeks to help a client "reduce or eliminate sexual or romantic attractions or feelings toward an individual of the same gender," that conversation is unlawful.

102. But if a counseling conversation "provides acceptance, support, or understanding" of an individual's "sexual or romantic attractions or feelings toward an individual of the same gender," it is permitted.

103. Mental health professionals found to violate HB 4616 are "subject to disciplinary action and licensing sanctions as provided under sections 16221(a) and 16226 of the public health code, 1978 PA 368, MCL 333.16221 and 333.16226."  MCL 330.1901a. These sanctions include probation, limitation, denial, suspension, revocation, or permanent revocation of one's license; restitution; or a fine "that does not exceed $250,000.00." MCL 333.16226.

104. HB 4616 does not include a religious exemption.

105. HB 4616 is not limited to counseling provided for a fee.

### C. Defendants' Enforcement of HB 4616

106. HB 4616 is enforced by the Department of Licensing and Regulatory Affairs (LARA), including the Bureau of Licensing and the Michigan Board of Counseling, the Department of Health and Human Services, and the Attorney General's Office, either on their own initiative or in response to complaints filed by private parties.

107. These entities may impose a wide range of disciplinary sanctions, including imposing fines, denying licensure, imposing licensing restrictions, putting licensees on probation, revoking or suspending licenses, issuing reprimands, or requiring payment of restitution.

108. The Michigan Attorney General's Office represents state agencies in these administrative proceedings and prosecutes licensees for violations.

109. Private parties may also file a complaint with the Boards, which triggers review by the relevant disciplinary subcommittee. *See File a Complaint with BPL*, Licensing and Regulatory Affairs, https://perma.cc/L6NN-9G9H.

110. Michigan actively enforces its licensing regulations, both on its own initiative and in response to privately filed complaints.

111. Every year, the Bureau of Professional Licensing, LARA, and the Michigan Governor prepare a report to the Michigan Legislature documenting statistics such as investigations conducted, complaints issued, settlements reached, disciplinary actions taken, and final orders issued.

112. In fiscal year 2023, the Bureau of Licensing received and processed 6,371 new complaints against healthcare professionals, conducted 1,861 investigations, issued 868 administrative complaints, and suspended 123 licensed professionals. *See Health Professional Disciplinary Reform: FY 2023 Report to the Legislature* at 6, Bureau of Professional Licensing (Apr. 1, 2024), https://perma.cc/B39C-NZ89.

113. The Boards and Disciplinary Subcommittees accepted 605 settlements negotiated by the Michigan Attorney General, issued 121 final orders with sanctions, and issued in total 726 final disciplinary orders that included 1,545 sanctions. Those sanctions included fines, probation, suspensions, and license revocations.

114. Previous reports show similar statistics, demonstrating that Michigan is actively enforcing its licensing regulations. *See Health Professional Disciplinary Reform FY 2022 Report to the Legislature* at 4, 6, Bureau of Professional Licensing (Mar. 31, 2023), https://perma.cc/M4WH-EHG9 (758 settlements, 178 final orders with sanctions, and 936 final disciplinary orders with 1,998 sanctions); *Health Professional Disciplinary Reform FY 2021 Report to the Legislature* at 4, 6, Bureau of Professional Licensing (Mar. 31, 2022), https://perma.cc/D45Y-XUYQ (759 settlements, 155 final orders with sanctions, and 914 final disciplinary orders with 1,882 sanctions); *Health Professional Disciplinary Reform FY 2020 Report to the Legislature* at 6, Bureau of

Professional Licensing (Mar. 30, 2021), https://perma.cc/43NH-8WCL (1,006 settlements, 261 final orders with sanctions, and 1,267 final disciplinary orders with 2,569 sanctions); *Health Professional Disciplinary Reform FY 2019 Report to the Legislature* at 4, 6, Bureau of Professional Licensing (June 7, 2021), https://perma.cc/RNT8-RBBZ (961 settlements, 271 final orders with sanctions, and 1,232 final disciplinary orders with 2,527 sanctions); *Health Professional Disciplinary Reform FY 2018 Report to the Legislature* at 6, Bureau of Professional Licensing (Jan. 8, 2020) https://perma.cc/VT69-QA2S (1,311 final orders and 1,922 disciplinary actions); *Health Professional Disciplinary Reform FY 2017 Report to the Legislature* at 6, Bureau of Professional Licensing (May. 27, 2019), https://perma.cc/9ZA5-ZJLZ (1,707 final orders and 2,190 disciplinary actions); *Health Professional Disciplinary Reform FY 2016 Report to the Legislature* at 5-6, Bureau of Professional Licensing (Mar. 27, 2019), https://perma.cc/EJV8-ZAGM (1,289 final orders and 2,538 disciplinary actions); *Health Professional Disciplinary Reform FY 2015 Report to the Legislature* at 5, 7, Bureau of Professional Licensing (Apr. 4, 2016), https://perma.cc/X5RH-BE7A (1,237 final orders and 1,222 disciplinary actions).

## III. Effects of Defendants' Speech Restrictions

### A. Effect of HB 4616 on Plaintiffs

115. Plaintiffs intend to continue helping young people live consistently with their own religious beliefs on matters of gender identity and sexuality—including young people who desire to align their gender identity with their biological sex, or who desire to refrain from acting on sexual attractions outside the context of male–female marriage.

116. HB 4616 prohibits Plaintiffs from using their professional training to help young people who have these goals.

19

117. If Plaintiffs provide such counseling, HB 4616 threatens them with complaints, investigation, and other penalties—including the loss of their professional licenses (and, consequently, their livelihoods) and fines up to $250,000.

118. Plaintiffs face a credible threat of enforcement under HB 4616.

119. Michigan actively enforces the provisions of its Mental Health Code, investigating thousands of complaints and issuing hundreds or thousands of disciplinary orders each year.

120. Even if Plaintiffs' clients are satisfied with their counseling, Michigan's law permits third parties to submit complaints about Plaintiffs to state authorities. Thus, Plaintiffs can face enforcement of HB 4616 based on complaints filed by ideological opponents or activists who find out about their approach to counseling.

121. Counselors in other states who have spoken publicly about adopting a cautious approach (like Plaintiffs'), rather than a gender-affirming approach, have been targeted by unrelated adult activists who filed complaints against them. These complaints triggered investigations and eventually drove at least one of the targeted counselors to stop working with youth altogether. Pamela Paul, Opinion, *As Kids, They Thought They Were Trans. They No Longer Do.*, N.Y. Times (Feb. 2, 2024), https://perma.cc/53LF-DXB5.

122. The threat of enforcement has chilled Plaintiffs' speech with their clients.

123. While Plaintiffs continue to see minor clients, their discussions about sex, sexual orientation and attraction, sexual behavior, and gender expression are more guarded and cautious. This is particularly true when a new client raises these topics or when an existing client broaches them for the first time. Absent HB 4616, they would have open, candid conversations with their clients about all issues that the client wishes to address.

124. Plaintiffs are not the only ones concerned with enforcement of these bans. Several studies highlight that "'accidentally' conducting [conversion therapy] is felt

20

to be a very real fear" on the part of therapists. Peter Jenkins & Dwight Panozzo, *"Ethical Care in Secret": Qualitative Data from an International Survey of Exploratory Therapists Working with Gender-Questioning Clients*, 50 J. Sex & Marital Therapy 557, 560 (2024). "The threat hanging over every therapist's head if they don't affirm causes real damage—it makes therapists want to avoid talking about gender altogether or it makes therapists have to do ethical care in secret." *Id.* at 575; *see also* Cass Review at 202 (noting "concerns about the interpretation of potential legislation on conversion practices").

### B. Effect of HB 4616 on Plaintiffs' Clients

125. Because Plaintiffs are chilled or prohibited from discussing issues of human sexuality and gender identity, their clients are denied access to ideas they wish to hear and to counseling that would help them live consistently with their own personal, religious, and life goals.

126. Parents of these children are likewise deprived of their right to direct the religious upbringing of their children by obtaining counseling that respects their religious identity.

127. This acutely impacts religious minorities. Such religious minorities are underrepresented among counselors generally, and it is especially difficult to find counselors willing to counsel minors who are struggling to reconcile their faith with their gender identity and sexuality.

128. HB 4616 also harms Michigan youth. As the Cass Review notes, "[a]ny ambiguity [with potential legislation on conversion practices] could serve to further disadvantage these children and young people rather than support them." Cass Review at 202. Counselors may become "fearful of accepting referrals of these children and young people," *id.*, reducing access to competent counselors or causing counselors to tip-toe around—rather than address head-on—the real, underlying issues that a child faces.

## CLAIMS FOR RELIEF

### Count I
### First Amendment Freedom of Speech:
### Content and Viewpoint Discrimination

129. Plaintiffs incorporate by reference all preceding paragraphs.

130. HB 4616 violates the First Amendment's Free Speech Clause, both facially and as applied, by restricting the speech Plaintiffs may engage in with minor clients.

131. The First Amendment's Free Speech Clause protects Plaintiffs' freedom to speak with clients, including regarding the clients' problems, questions, and goals.

132. If the government imposes a content-based restriction on speech, the restriction is subject to strict scrutiny. A viewpoint-based restriction is per se unconstitutional.

133. HB 4616, both facially and as applied, is a content-based restriction on speech because it prohibits Plaintiffs' speech "based on its communicative content." *NIFLA v. Becerra*, 585 U.S. 755, 766 (2018). Talk therapy that communicates with a client in a way that seeks to "change an individual's sexual orientation or gender identity" is prohibited; talk therapy that communicates with a client in other ways is permitted.

134. HB 4616, both facially and as applied, is also a viewpoint-based restriction on speech because it prohibits speech expressing a particular viewpoint on gender identity, sexual orientation, and human sexuality. For example, speech that supports and affirms an individual's desire to undergo a gender transition is permitted. Speech that supports and affirms an individual's desire to embrace her biological sex is forbidden.

135. HB 4616 also compels speech by requiring counselors to speak to clients on the premise that seeking to align one's sense of gender identity with one's biological sex, or seeking refrain from acting on sexual attraction to members of the same sex, is not possible or desirable, and will be harmful, regardless of the client's own life

goals and religious beliefs. It also compels speech by requiring counselors to speak words affirming social and medical transition away from a client's biological sex even if the counselor does not believe that it is in the client's best interest to do so. This alters the counselor's speech and violates the counselor's ethical obligation to consider the unique circumstances of each client.

136. Because HB 4616 discriminates based on viewpoint, it is per se invalid.

137. At minimum, because HB 4616 is content- and viewpoint-based, it is subject to strict scrutiny.

138. HB 4616 fails strict scrutiny—both because HB 4616 does not further a compelling governmental interest and because HB 4616 is not the least restrictive means of furthering a governmental interest.

139. HB 4616 does not further an interest in protecting children. Rather, HB 4616 harms children.

140. HB 4616 fails intermediate scrutiny. That is, it does not serve a significant governmental interest, and it is not narrowly tailored to serve such an interest.

141. Michigan has numerous less-restrictive means for achieving its alleged interests.

142. HB 4616 is also underinclusive, as Michigan permits speech by counselors that is harmful to clients, while prohibiting Plaintiffs' speech, which is helpful to clients.

143. As a result of Defendants' violation of the Free Speech Clause of the First Amendment, Plaintiffs have suffered and will suffer irreparable harm, including the loss of their constitutional rights, and are entitled to injunctive, declaratory, and monetary relief.

## Count II
## First Amendment Freedom of Speech:
## Unreasonable Restriction

144. Plaintiffs incorporate by reference all preceding paragraphs.

145. Even where the government is permitted to regulate speech based on its content, such restrictions on speech "must be reasonable and viewpoint neutral." *Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Transportation*, 978 F.3d 481, 493 (6th Cir. 2020) (citing *Minn. Voters All. v. Mansky*, 585 U.S. 1, 16-23 (2018)).

146. To be reasonable, a restriction must offer a "sensible basis for distinguishing what may come in from what must stay out." *Mansky*, 585 U.S. at 16. This requires "objective, workable standards" for those enforcing the restriction. *Id*. at 21.

147. HB 4616 does not have objective, workable standards. For example, it prohibits speech that seeks to "change" an individual's "gender identity," but permits speech that seeks to "facilitate" "gender identity" "development." MCL 330.1100a(20). However, it offers no guidance on how to distinguish between gender identity "change" and gender identity "development."

148. Moreover, "gender identity" itself is defined subjectively (and circularly) as "having a gender-related self-identity." MCL 37.2103(f).

149. Nor is there an objective, workable standard to apply HB 4616's carveout for counseling that "provides acceptance, support, or understanding of an individual," or "facilitates an individual's coping, social support, or identity exploration and development," or constitutes "sexual orientation-neutral intervention."

150. Such terms cannot be objectively applied. Such terms also invite selective, discriminatory enforcement. Thus, HB 4616 is an unreasonable restriction on speech under the First Amendment.

151. As a result of Defendants' violation of the Free Speech Clause of the First Amendment, Plaintiffs have suffered and will suffer irreparable harm, including the

loss of their constitutional rights, and are entitled to injunctive, declaratory, and monetary relief.

**Count III**
**First Amendment Freedom of Speech:**
**Right to Receive Information**

152. Plaintiffs incorporate by reference all preceding paragraphs.

153. Facially and as applied, HB 4616 violates Plaintiffs' clients' right to hear speech.

154. The First Amendment protects not only the right to disseminate information but also the "reciprocal right to receive" information. *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756-57 (1976).

155. HB 4616 is unconstitutional, both facially and as applied, because it prohibits Plaintiffs' minor clients from receiving talk therapy that helps the clients pursue their own personal goals relating to their sexual behavior, gender expression, sexual orientation, or gender identity. HB 4616 therefore violates Plaintiffs' clients' First Amendment right to hear speech that they actively desire to hear.

156. Absent HB 4616, Plaintiffs' minor clients would be free to, and would, receive such talk therapy from Plaintiffs.

157. For the reasons explained in Count I, HB 4616 is content- and viewpoint-based and must satisfy strict scrutiny, which it cannot do.

158. Plaintiffs have standing to assert their clients' rights in this regard given their close relationships with their clients and the many obstacles to clients asserting their own interests. In addition, where First Amendment rights are violated (as here), the rules for representative standing are relaxed. *See Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004) (explaining that limitations on third-party standing are prudential, not constitutional, and are "lessen[ed]" in "the context of the First Amendment"); *see also Singleton v. Wulff*, 428 U.S. 106 (1976) (plaintiff-physicians satisfied Supreme

Court's closeness and hindrance requirements to bring claims on behalf of patients); *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 956-57 (1984) ("danger of chilling free speech" justifies a relaxed standard for standing).

159. As a result of Defendants' violation of the Free Speech Clause of the First Amendment, Plaintiffs' clients have suffered and will suffer irreparable harm, including the loss of their constitutional rights, and are entitled to injunctive, declaratory, and monetary relief.

### Count IV
### First Amendment Free Exercise of Religion:
### Not Neutral or Generally Applicable

160. Plaintiffs incorporate by reference all preceding paragraphs.

161. HB 4616 violates the First Amendment's Free Exercise Clause, both facially and as applied, by prohibiting Plaintiffs' religious exercise.

162. Laws burdening religious exercise are subject to strict scrutiny unless they are both neutral and generally applicable. *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 542 (1993).

163. Plaintiffs are engaged in religious exercise when they provide counseling that helps clients accomplish their own personal goals, including when they help a client live consistently with the client's own religious beliefs on matters of gender identity and sexuality.

164. HB 4616 burdens Plaintiffs' religious exercise.

165. HB 4616 is neither neutral nor generally applicable.

166. HB 4616 burdens religious adherents but almost no others.

167. HB 4616 was based on hostility to religion and hostility to a religious viewpoint.

168. HB 4616 treats comparable secular activity more favorably than religious exercise.

169. HB 4616 invites the government to consider the particular reasons for a person's conduct.

170. HB 4616 gives the government broad enforcement discretion to grant exemptions, decline to enforce, and to decide which reasons for not complying with it are worthy of solicitude.

171. Because HB 4616 is not neutral or generally applicable, it is subject to strict scrutiny, which it cannot satisfy. Defendants do not have a compelling reason for their actions, and Defendants have not selected the least restrictive means to further a compelling governmental interest.

172. To the extent Plaintiffs' free exercise claim is foreclosed by *Employment Division v. Smith*, 494 U.S. 872 (1990), the Supreme Court should overrule *Smith*.

173. As a result of Defendants' violation of the Free Exercise Clause of the First Amendment, Plaintiffs have suffered and will suffer irreparable harm, including the loss of their constitutional rights, and are entitled to injunctive, declaratory, and monetary relief.

### Count V
### First Amendment Free Exercise of Religion:
### Right to Direct the Religious Upbringing of Children

174. Plaintiffs incorporate by reference all preceding paragraphs.

175. "[T]he traditional interest of parents with respect to the religious upbringing of their children" is a "fundamental right[] and interest[]" and is "specifically protected by the Free Exercise Clause of the First Amendment." *Wisconsin v. Yoder*, 406 U.S. 205, 214 (1972); *see also Smith*, 494 U.S. at 881 ("the right of parents … to direct the education of their children" receives heightened scrutiny) (citing *Yoder* and *Pierce v. Soc'y of Sisters*, 268 U.S. 510 (1925)); *People v. DeJonge*, 501 N.W.2d 127, 134-35 (Mich. 1993).

27

176. Government actions that interfere with parents' ability to direct the religious upbringing of their children are subject to strict scrutiny. *Yoder*, 406 U.S. at 214.

177. By prohibiting counseling that would help parents transmit their religious beliefs regarding sex and gender to their children, Defendants have interfered with parents' right to direct the religious upbringing of their children.

178. HB 4616 must therefore satisfy strict scrutiny, which it cannot do. Defendants do not have a compelling reason for their actions, and Defendants have not selected the least restrictive means to further a compelling governmental interest.

179. Plaintiffs have standing to assert this claim because HB 4616's prohibition "threaten[s] with destruction" Plaintiffs' "business." *Pierce*, 268 U.S. at 535.

180. As a result of Defendants' violation of *Yoder* and *Pierce*, Plaintiffs have suffered and will suffer irreparable harm, including the loss of their constitutional rights, and are entitled to injunctive, declaratory, and monetary relief.

**Count VI**
**Fourteenth Amendment Due Process:**
**Void for Vagueness**

181. Plaintiffs incorporate by reference all preceding paragraphs.

182. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). Under the Due Process clause, a law is void for vagueness if (1) it fails to provide "fair notice" of what conduct is prohibited—*i.e.*, if citizens "of common intelligence must necessarily guess at its meaning and differ as to its application." *Ass'n of Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545, 551 (6th Cir. 2007). Likewise, a law is void for vagueness if (2) the law allows "arbitrary and discriminatory enforcement" on "an *ad hoc* and subjective basis." *Id.*

183. Laws burdening First Amendment rights are subject to a more searching vagueness inquiry. *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253-54 (2012)

("When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech.").

184. HB 4616 is unconstitutionally vague because it fails to provide fair notice of what conduct is prohibited. For example, HB 4616 purports to distinguish between counseling that "facilitates" an individual's "identity exploration and development" (which is permitted), and counseling that "seeks to change" an individual's "gender identity" (which is forbidden). But HB 4616 offers no objective basis for distinguishing between them. These are vague terms that cannot be applied without making untethered, subjective judgments.

185. HB 4616 is also unconstitutionally vague because its vague terms invite arbitrary and discriminatory enforcement.

186. As a result of Defendants' violation of the Due Process Clause of the Fourteenth Amendment, Plaintiffs have suffered and will suffer irreparable harm, including the loss of their constitutional rights, and are entitled to injunctive, declaratory, and monetary relief.

## JURY DEMAND

Plaintiffs request a jury trial on all issues so triable.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs request that the Court grant the following relief:

a.    Declare that HB 4616, both on its face and as applied, violates Plaintiffs' and their clients' rights under the Free Speech Clause of the First Amendment;

b.    Declare that HB 4616, both on its face and as applied, violates Plaintiffs' and their clients' rights under the Free Exercise Clause of the First Amendment;

c.    Declare that HB 4616 violates Plaintiffs' rights under the Due Process Clause of the Fourteenth Amendment;

d.   Issue a preliminary and permanent injunction prohibiting Defendants from enforcing HB 4616 against Plaintiffs or otherwise penalizing Plaintiffs for counseling clients on matters of gender identity and sexual orientation;

e.   Award nominal damages to Plaintiffs;

f.   Award actual damages to Plaintiffs;

g.   Award attorney's fees and costs to Plaintiffs; and

h.   Award such other relief as the Court may deem just and proper.

Dated: July 12, 2024                    Respectfully submitted,

/s/ Luke Goodrich
Luke Goodrich
Adèle Keim
Daniel L. Chen
Daniel Benson
Kelly R. Oeltjenbruns
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave. NW, Suite 400
Washington, DC 20006
Telephone: (202) 955-0095
Facsimile: (202) 955-0090