UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CATHOLIC CHARITIES OF JACKSON,
LENAWEE AND HILLSDALE COUNTIES
and EMILY MCJONES,

      Plaintiffs,

v.

GRETCHEN WHITMER, et al.,

      Defendants.

_____/

Case No. 1:24-cv-718

HON. JANE M. BECKERING

## OPINION AND ORDER

The United States Supreme Court has long recognized that States have broad power to regulate the practice of licensed professionals within their boundaries. *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 792 (1975). Effective February 13, 2024, Michigan joined more than twenty other States and the District of Columbia to prohibit state-licensed mental health professionals from engaging in conversion therapy with minors. Plaintiffs Catholic Charities of Jackson, Lenawee, and Hillsdale Counties ("Catholic Charities") and Emily McJones ("McJones") initiated this suit against Governor Gretchen Whitmer and other Michigan officials, alleging various claims in support of their proposition that Michigan's new law is unconstitutional. Now pending before the Court is Plaintiffs' Motion for a Preliminary Injunction (ECF No. 14), seeking to enjoin Defendants from enforcing the law during the pendency of this case. For the following reasons, Plaintiffs' motion is properly denied.

# I. BACKGROUND

## A. Legal Context

Understanding the legal context of this case is important.  This case is about licensed—i.e., state-regulated—mental health professionals in a treatment setting with minor clients.  Michigan regulates such services through two sets of laws, its Public Health Code, MICH. COMP. LAWS § 333.1101 *et seq.*, and Mental Health Code, MICH. COMP. LAWS § 330.1400 *et seq.*  This case does not involve government restrictions on family members, religious leaders, community members, or unlicensed mental health professionals.  This case also does not involve how licensed mental health professionals treat adult clients.

***Michigan's Public Health Code.***  The stated purpose of Michigan's Public Health Code is to "protect[] … the health, safety, and welfare of the people of this state."  MICH. COMP. LAWS § 333.1111(2).  Michigan's Public Health Code regulates licensing and educational requirements for professionals in Michigan, including mental health professionals like counselors, psychologists, social workers, marriage and family therapists, and behavior analysts.   The Public Health Code also creates various boards that govern professional licenses.  Relevant here are the sections of the Public Health Code that govern counseling.  *See* MICH. COMP. LAWS §§ 333.18101– 18117.  The Public Health Code defines "counseling," MICH. COMP. LAWS §§ 333.18101, 18115, 18117; creates the Michigan Board of Counseling, *id.* § 333.18103; and states that a licensee "shall not perform any acts, tasks, or functions within the practice of counseling unless he or she is trained" to do so, *id.* § 18105(1).  The Public Health Code also delineates educational and supervisory requirements for various counseling licenses and describes how counselors may hold themselves out professionally.  *See id.* §§ 18106–18116.  The Public Health Code outlines similar

guidance for marriage and family therapists, MICH. COMP. LAWS §§ 333.16901–16915; psychologists, *id.* §§ 18201–18237; and social workers, *id.* §§ 18501–18518.

Michigan's Administrative Code for Licensing and Regulatory Affairs–Bureau of Professional Licensing, R 338.1 *et seq.*, implements the licensing and educational requirements specified in the Public Health Code.  *See* R 338.1751–1781 (counselors); R 338.2521–338.2585 (psychologists); R 338.2921–2965 (social workers); and R 338.7201–7219 (marriage and family therapists).

Michigan law delineates a plethora of grounds for discipline of its licensed health care professionals, such as committing negligence, being convicted of a crime, employing false or misleading advertising, betraying a professional confidence, and making inappropriate referrals. *See generally* MICH. COMP. LAWS § 333.16221(a)–(y) (detailing prohibited activities).  The Department of Licensing and Regulatory Affairs (LARA) is required to investigate any allegation that one or more of the grounds for disciplinary subcommittee action exist, and LARA may investigate activities related to the practice of a health profession by a licensee, a registrant, or an applicant for licensure or registration.  MICH. COMP. LAWS § 333.16221.  An individual or organization who believes that a licensed professional or business has engaged in behavior that violates the Public Health Code can file a complaint with the Bureau of Professional Licensing. *See* File a Complaint with BPL, Licensing and Regulatory Affairs, https://perma.cc/7LHH-NKT5. LARA may hold hearings, administer oaths, and order the taking of relevant testimony.  MICH. COMP. LAWS § 333.16221.  After its investigation, LARA provides a copy of the administrative complaint to the appropriate disciplinary subcommittee, and the disciplinary subcommittee proceeds under § 16226.  *Id.*  The sanctions therein include probation; denial, suspension, or revocation of a license; restitution; and fines up to $250,000.  MICH. COMP. LAWS § 333.16226(1),

(3).  Marlon Brown is the Director of LARA, and Amy Gumbrecht is the Director of LARA's Bureau of Professional Licensing (Compl. ¶¶ 18–19).  Dana Nessel is the Attorney General of Michigan and has the authority to enforce and prosecute violations of the Public Health Code (*id.* ¶ 17, citing MICH. COMP. LAWS § 333.16291).

*Michigan's Mental Health Code.*  Michigan's Mental Health Code governs the delivery of mental health services.  Like the Public Health Code, the Mental Health Code prohibits mental health professionals from "perform[ing] an act, task, or function within the field of mental illness or developmental disability unless he or she has been trained" to do so or is acting under a trained supervisor.  MICH. COMP. LAWS § 330.1901.

The Michigan Legislature amended Michigan's Mental Health Code with the passage of two new bills—House Bills 4616 and 4617 (collectively, "HB 4616").  Governor Gretchen Whitmer signed the bills into law on July 26, 2023, and the laws took effect on February 13, 2024.  HB 4616 added § 901a, which provides in pertinent part that "[a] mental health professional shall not engage in conversion therapy with a minor."  MICH. COMP. LAWS § 330.1901a.  HB 4617, in turn, defines "conversion therapy" as follows:

> "Conversion therapy" means any practice or treatment by a mental health professional that seeks to change an individual's sexual orientation or gender identity, including, but not limited to, efforts to change behavior or gender expression or to reduce or eliminate sexual or romantic attractions or feelings toward an individual of the same gender.  Conversion therapy does not include counseling that provides assistance to an individual undergoing a gender transition, counseling that provides acceptance, support, or understanding of an individual or facilitates an individual's coping, social support, or identity exploration and development, including sexual orientation-neutral intervention to prevent or address unlawful conduct or unsafe sexual practices, as long as the counseling does not seek to change an individual's sexual orientation or gender identity.  As used in this subsection:

4

> > (a) "Gender identity" means "gender identity or expression" as that term is defined in section 103 of the Elliott-Larsen civil rights act, 1976 PA 453, MCL 37.2103.[1]
> >
> > (b) "Sexual orientation" means that term as defined in section 103 of the Elliot-Larsen civil rights act, 1976 PA 453, MCL 37.2103.[2]

MICH. COMP. LAWS § 330.1100a(20).

> Michigan's Mental Health Code defines "mental health professional" as—

> an individual who is trained and experienced in the area of mental illness or developmental disabilities and who is 1 of the following:

> > (a) A physician.

> > (b) A psychologist.

> > (c) A registered professional nurse licensed or otherwise authorized to engage in the practice of nursing under part 172 of the public health code, 1978 PA 368, MCL 333.17201 to 333.17242.

> > (d) A licensed master's social worker licensed or otherwise authorized to engage in the practice of social work at the master's level under part 185 of the public health code, 1978 PA 368, MCL 333.18501 to 333.18518.

> > (e) A licensed professional counselor licensed or otherwise authorized to engage in the practice of counseling under part 181 of the public health code, 1978 PA 368, MCL 333.18101 to 333.18117.

> > (f) A marriage and family therapist licensed or otherwise authorized to engage in the practice of marriage and family therapy under part 169 of the public health code, 1978 PA 368, MCL 333.16901 to 333.16915.

MICH. COMP. LAWS § 330.1100b(19).  A "minor" is defined as "an individual under the age of 18 years." *Id.* § 1100b(20).  In recent years, more than twenty States and the District of Columbia

---

[1] "Gender identity" is defined at MICH. COMP. LAWS § 37.2103(f) as "having or being perceived as having a gender-related self-identity or expression whether or not associated with an individual's assigned sex at birth."

[2] "Sexual orientation" is defined at MICH. COMP. LAWS § 37.2103(l) as "having an orientation for heterosexuality, homosexuality, or bisexuality or having a history of such an orientation or being identified with such an orientation."

have adopted laws prohibiting or restricting the practice of conversion therapy by the mental health professionals they license to practice.[3]

## B.  Factual Background

Plaintiffs are mental health professionals subject to Michigan's new law (Compl. ¶ 97). Catholic Charities is a Michigan nonprofit organization that carries out the work of the Roman Catholic Church in pertinent part by providing individual, family, and marital therapy (*id.* ¶¶ 14, 25, 28).  Catholic Charities represents that it employs sixteen state-licensed counselors, including a declarant in this case, Lisa Veenstra, to provide counseling and therapy to individuals and families (Sue Lewis Decl. [Pls. Ex A, ECF No. 15-1] ¶ 7; Ex. B, Lisa Veenstra Decl. [Pls. Ex B, ECF No. 15-2] ¶ 15).  According to Plaintiffs, Catholic Charities provides counseling services in a manner consistent with its Catholic beliefs, including the Catholic teachings on gender identity and human sexuality, which are to respect the "biological sex of the human person as given by God" and the belief that "marriage is a lifelong commitment between one man and one woman and that the deliberate use of the sexual faculty, for whatever reason, outside of marriage is essentially contrary to its purpose" (Compl. ¶¶ 31–32).  Catholic Charities represents that its counselors are "not able to counsel their clients to pursue a gender identity that is not aligned with a client's biological sex or to act on same-sex romantic attractions" (Lewis Decl. ¶ 24).  If its clients wish to pursue a gender identity that is "not aligned with a client's biological sex or to act on same-sex romantic attractions," then Catholic Charities "refer[s] them to other counselors in the community" (*id.*).

---

[3] *Tingley v. Ferguson*, ___ U.S. ___; 144 S. Ct. 33, 35; 217 L. Ed. 2d 251 (2023) (Alito, J., dissenting from the denial of certiorari). *See also* Amici States Br., ECF No. 33 at PageID.1083–1084 ("Over twenty-five other States and the District of Columbia have similar legislation or executive orders prohibiting or restricting licensed healthcare professionals from providing conversion therapy for minors"), and Addendum, PageID.1107–1108 (collecting authorities).

McJones is a state-licensed therapist who operates her own practice, "Little Flower Counseling," in Lansing, Michigan (Compl. ¶¶ 15, 42).  According to Plaintiffs, McJones is a "devout Catholic" who "provides evidenced-based treatments from a perspective that is faithful to the teachings of the Catholic Church, while loving and caring for each client" (*id.* ¶¶ 15, 38, 45).

Plaintiffs allege that they face sanctions under Michigan's new law as they admittedly provide talk therapy that seeks to help minor clients "change their behavior or gender expression" to align with the clients' goals and religious beliefs on matters of gender identity and same-sex sexual relationships (*id.* ¶¶ 6, 123, quoting MICH. COMP. LAWS § 330.1100a(20)); *see also* Veenstra Decl. ¶¶ 31–36; McJones Decl. [Pls. Ex. C, ECF No. 15-3] ¶¶ 37–44, 48–49.

### C.  Procedural Posture

On July 12, 2024, pursuant to 42 U.S.C. § 1983, Plaintiffs filed this action against the following thirty-four Defendants, in their official capacities: Governor Whitmer, Attorney General Nessel, LARA Director Brown, Bureau of Professional Licensing Director Gumbrecht, Michigan Department of Health and Human Services (MDHHS) Director Elizabeth Hertel, the twelve members of the Michigan Board of Counseling, the nine members of the Michigan Board of Social Workers, and the eight members of the Michigan Board of Psychology (ECF No. 1).  Plaintiffs allege that HB 4616 violates the First Amendment right to freedom of speech (Counts I–III), the First Amendment right to free exercise of religion (Counts IV & V), and the Fourteenth Amendment right to due process (Count VI) (*id.*).  Plaintiffs seek declaratory, injunctive, and monetary relief, as well as costs and attorney fees (*id.* at PageID.32–33).

One week later, on July 19, 2024, Plaintiffs filed this Motion for a Preliminary Injunction (ECF No. 14).  On August 16, 2024, Defendants filed their response in opposition to the motion (ECF No. 27), and Plaintiffs filed a reply to the response on August 30, 2024 (ECF No. 31).  This

Court also has the benefit of amicus briefs filed by David Weidis, the founder and Executive Director of Serving-Leaders Ministries; The Ethics and Public Policy Center; the Council on American Islamic Relations-Michigan (CAIR-MI); Equality Michigan; and the State of Washington, on behalf of itself as well as the States of California, Colorado, Connecticut, Delaware, Hawaii, Illinois, Maine, Maryland, Minnesota, Nevada, New Jersey, New Mexico, New York, Oregon, Rhode Island, Vermont, and Wisconsin (hereinafter "Amici States") (ECF Nos. 23–25, 29, & 33).  Last, on September 20, 2024, the parties submitted a supplemental authority for the Court's review (ECF Nos. 36 & 37).  Having considered the submissions, the Court concludes that oral argument is unnecessary to resolve the issues presented.  *See* W.D. Mich. LCivR 7.2(d).

## II.  ANALYSIS

### A.  Motion Standard

"Preliminary injunctions are 'extraordinary and drastic remed[ies] ... never awarded as of right.'"  *Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Supreme Court*, 769 F.3d 447, 453 (6th Cir. 2014) (examining a preliminary injunction that preserved the "state-law status quo") (quoting *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008)).  "[T]hat is why the plaintiff bears the burden to justify relief, even in First Amendment cases."  *Id.* (citing *McNeilly v. Land*, 684 F.3d 611, 615 (6th Cir. 2012) (citing *Granny Goose Foods, Inc. v. Teamsters*, 415 U.S. 423, 441 (1974)).

In evaluating a request for a preliminary injunction, a district court considers (1) the movant's likelihood of success on the merits; (2) whether the movant will suffer irreparable injury without a preliminary injunction; (3) whether issuance of a preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of a preliminary injunction.  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *James*

*B. Oswald Co. v. Neate*, 98 F.4th 666, 672 (6th Cir. 2024); *Ohio v. Becerra*, 87 F.4th 759, 768 (6th Cir. 2023) (citing *City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (per curiam) (en banc)).  "[T]he district court balances four factors—not one—even in First Amendment cases." *Platt, supra* (citing, e.g., *Doran v Salem Inn, Inc.*, 422 U.S. 922, 931 (1975) (separately balancing "irreparable injury" in a First Amendment case)).

That said, the factors of irreparable harm and consideration of the public interest largely depend on whether a constitutional violation exists. *Libertarian Party of Ohio v. Hulsted*, 751 F.3d 403, 412 (6th Cir. 2014); *Liberty Coins, LLC v. Goodman*, 748 F.3d 682, 689–90 (6th Cir. 2014). *See also O'Toole v. O'Connor*, 802 F.3d 783, 792 (6th Cir. 2015) (observing that while "the 'likelihood of success' prong is the most important," it is "only one of the factors to be considered by a court").  The final two factors, the harm to others and the public interest, "merge when the Government is the opposing party." *Slyusar v. Holder*, 740 F.3d 1068, 1074 (6th Cir. 2014) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)); *Gun Owners of Am., Inc. v. Barr*, No. 19-1298, 2019 WL 1395502, at *1 (6th Cir. Mar. 25, 2019) (same).

Ultimately, determining whether the four preliminary injunction factors weigh in favor of granting or denying preliminary injunctive relief is within the district court's discretion. *Dahl v. Bd. of Trustees of W. Michigan Univ.*, 15 F.4th 728, 731 (6th Cir. 2021); *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.,* 511 F.3d 535, 541 (6th Cir. 2007).  *See also Louisiana-Pac. Corp. v. James Hardie Bldg. Prod., Inc.*, 928 F.3d 514, 517 (6th Cir. 2019) (instructing that a court should "balance rather than tally these factors").

Federal Rule of Civil Procedure 65, which governs the issuance of preliminary injunctions, does not explicitly require the court to conduct an evidentiary hearing before issuing an injunction. FED. R. CIV. P. 65(a)(1).  The Sixth Circuit Court of Appeals has held that an evidentiary hearing

is only required when there is a disputed factual issue and the documentary evidence upon which to base an "informed, albeit preliminary, conclusion" is inadequate.  *Certified Restoration*, 511 F.3d at 552–53 (quoting *S.E.C. v. G. Weeks Sec., Inc.,* 678 F.2d 649, 651 (6th Cir. 1982)). Additionally, "the findings of fact and conclusions of law made by a court granting the preliminary injunction are not binding at trial on the merits." *Univ. of Texas v. Camenisch,* 451 U.S. 390, 395 (1981).  *See, e.g., Brown v. Int'l Bhd. of Elec. Workers, Loc. Union No. 58 AFL-CIO*, 936 F.2d 251, 255–56 (6th Cir. 1991) (rejecting the argument that the district court's findings in connection with a motion for preliminary injunction resolved the disputed issue of fact, even if the district court subsequently makes the same findings at trial).

**B.  Discussion**

Plaintiffs argue that Michigan's new law violates the Constitution in multiple respects. First, Plaintiffs argue that the law violates the Free Speech Clause because it discriminates based on content and viewpoint and cannot satisfy reasonableness review, let alone intermediate or strict scrutiny (ECF No. 15 at PageID.138–151).  Second, Plaintiffs argue that the law violates the Free Exercise Clause because it is not neutral or generally applicable and concomitantly violates the right of parents to direct the religious upbringing of their children (*id.* at PageID.138, 155–159). Third, Plaintiffs argue that the law violates the Due Process Clause because it does not give Plaintiffs fair notice of what speech is prohibited and instead invites arbitrary and discriminatory enforcement (*id.* at PageID.138, 153–155).  Plaintiffs conclude that given their likelihood of success on these claims, and that the remaining injunction factors also strongly favor relief, enforcement of the law should be preliminarily enjoined (*id.* at PageID.138, 159–160).

In response, as a threshold matter, Defendants argue that Plaintiffs have alleged merely that they "facilitate the development of their clients' sexual orientations or gender identities—

which HB 4616 explicitly permits" (ECF No. 27 at PageID.531).  Defendants argue that Plaintiffs have not established that they are engaged, or wish to engage, in any conduct that Michigan's new law prohibits and therefore cannot show any credible threat of enforcement and consequently lack pre-enforcement standing (*id.* at PageID.531, 540).  On the merits of Plaintiffs' claims, Defendants argue that the law does not violate the First Amendment's Free Speech Clause because it regulates the provision of medical care, not constitutionally protected speech (*id.* at PageID.550–562).  According to Defendants, "the First Amendment does not protect a therapist's right to provide harmful mental-health care" (*id.* at PageID.549).  Second, Defendants argue that Michigan's law does not violate the Free Exercise Clause because it does not burden religious conduct, as compared to secular conduct, and, in any event, is neutral and generally applicable (*id.* at PageID.563–568).  Third, Defendants argue that the law does not violate the Due Process Clause because it is not unconstitutionally vague and uses terms that are not difficult to understand or apply, especially for a licensed mental health practitioner (*id.* at PageID.569–571).  Last, Defendants briefly argue that the remaining preliminary injunction factors weigh against the issuance of a preliminary injunction (*id.* at PageID.571–573).

In reply to Defendants' standing argument, Plaintiffs point out that the text of Michigan's law expressly bans "any practice" that seeks to change "behavior or gender expression," with no carve-out for a minor client's self-chosen goals (ECF No. 31 at PageID.1047).  According to Plaintiffs, Defendants' attempt to narrow the law distorts the text in three respects:  (1) Defendants truncate the definition of conversion therapy to omit a key clause that dramatically expands the statute's reach, to wit:  "including, but not limited to, efforts to change behavior or gender expression"; (2) Defendants distort the phrase "seeks to change"  to prohibit "seek[ing] to change … gender identity [contrary to the client's self-determined outcome]"; and (3) Defendants ignores

the "as long as" clause in the carve-out for "identity exploration and development," which expressly applies only "as long as the counseling does not seek to change an individual's sexual orientation or gender identity" (*id.* at PageID.1049–1050).

The Court turns first to the threshold issue of standing and then to application of the preliminary-injunction factors to the facts as developed in the record thus far. The Court will focus its analysis on Plaintiffs' likelihood of success on the merits of each respective claim. The Court will then briefly discuss the remaining factors to determine whether, on balance, the factors weigh in favor of granting or denying preliminary injunctive relief.

## 1. **Standing**

Article III, § 2 of the United States Constitution provides that the judicial power of the federal courts "extends only to 'Cases' and 'Controversies.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016) (quoting U.S. CONST. Art. III, § 2). Standing "ensure[s] that federal courts do not exceed their authority" and "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." *Id.* The doctrine of standing, which is one of several doctrines that reflect this fundamental limitation, requires federal courts to satisfy themselves that "the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (quoting *Warth v. Seldin*, 422 U.S. 490, 498–99 (1975) (describing standing as the "threshold question in every federal case").

The "irreducible constitutional minimum of standing" requires the plaintiff to show "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed

by a favorable decision." *State by & through Tennessee Gen. Assembly v. United States Dep't of State*, 931 F.3d 499, 507 (6th Cir. 2019) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000)). *See also Hearring v. Sliwowski*, 806 F.3d 864, 868 (6th Cir. 2015) ("To establish standing for a forward-looking injunction, a party must show a 'threat of suffering 'injury in fact' that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical.'") (quoting *Summers*, 555 U.S. at 493).

The plaintiff bears the burden of establishing the standing elements "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). At the pleading stage, a plaintiff's burden is simply to "plausibly" assert standing. *Ass'n of Am. Physicians & Surgeons v. FDA*, 13 F.4th 531, 543–44 (6th Cir. 2021). In determining whether a plaintiff has established standing, courts consider the complaint and any documents attached to the complaint. *Mackinac Ctr. for Pub. Pol'y v. Cardona*, 102 F.4th 343, 350 (6th Cir. 2024). The factual allegations therein are accepted as true and construed in the plaintiff's favor; however, a court need not accept the complaint's legal conclusions as true. *Id.* at 350–51 (citing, in pertinent part, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Where a plaintiff cannot establish constitutional standing for a particular claim, the claim must be dismissed for lack of subject matter jurisdiction. *Schickel v. Dilger*, 925 F.3d 858, 866 (6th Cir. 2019). *See, e.g., Mackinac Ctr.*, 102 F.4th at 358 ("Because Plaintiffs failed to show that they suffered an injury in fact for any of the claims they asserted, the district court lacked subject-matter jurisdiction to adjudicate their claims.").

Defendants do not generally challenge the "traceability" or "redressability" components of Plaintiffs' claim to standing in this case.[4]  Only the injury-in-fact component is at issue.  The Supreme Court has explained that a plaintiff need not wait for "an actual arrest, prosecution, or other enforcement action" to challenge a law.  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014).  Such a plaintiff may instead establish "injury in fact" by showing: "(1) an intent to engage in 'expression that the [Constitution] arguably protects,' (2) that this expression is arguably prohibited by [the state's] laws, and (3) that there exists a 'credible threat of enforcement' for engaging in that expression."  *Kareem v. Cuyahoga Cnty. Bd. of Elections*, 95 F.4th 1019, 1022 (6th Cir. 2024) (quoting *Driehaus*, *supra*).  Because Defendants do not dispute Plaintiffs' intentions, the Court's analysis focuses on whether Plaintiffs have plausibly alleged that (1) their "intended future conduct is 'arguably ... proscribed by the statute' they wish to challenge" and (2) there is a "substantial" or "credible threat of enforcement" of the statute against them.

***Arguable Proscription.***  Standing is plausible in a pre-enforcement challenge when the plaintiff pleads "when, to whom, where, or under what circumstances" its injury will occur.

---

[4] Redressability is at issue with respect to Plaintiffs' standing to bring claims against MDHHS Director Hertel.  Defendants argue that Plaintiffs lack standing to bring their claims against Defendant Hertel because no alleged injury could be redressed by a judgment founded upon the statutory section upon which Plaintiffs rely (Resp., ECF No. 27 at PageID.548–549).  The Court agrees.  Plaintiffs named Hertel as a Defendant because, according to Plaintiffs, Hertel may "make inspections necessary to enforce this chapter and rules promulgated under" (Compl. ¶ 20, citing MICH. COMP. LAWS § 330.1273(3)).  Paragraph 20 contains the only reference to Hertel in Plaintiffs' Complaint.  The cited statutory section falls within the chapter governing Substance Use Disorder Services, and the full text of subsection (3) provides that "[t]he department may issue licenses; require reports; establish standards and procedures; and make inspections necessary to enforce this chapter and rules promulgated under this chapter; and provide technical assistance for the guidance of substance use disorder service programs in complying with the requirements and rules promulgated under this chapter."  MICH. COMP. LAWS § 330.1273(3).  Plaintiffs do not respond to Defendant' argument in their reply brief, and the Court determines that Plaintiffs have failed to satisfy their burden of demonstrating standing to pursue their claims against Defendant Hertel, if not abandoned these claims.  Accordingly, Plaintiffs' claims against Defendant Hertel are properly dismissed.

14

*Christian Healthcare Centers, Inc. v. Nessel*, 117 F.4th 826, 842 (6th Cir. 2024) (citation omitted). However, litigants need only show that the law "arguably" prohibits their "intended future conduct[.]" *Driehaus*, 573 U.S. at 162 (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)). Plaintiffs need not prove their speech is actually prohibited; rather, it is enough if their speech is "arguably proscribed" by "at least a plausible interpretation of the statute." *Kentucky v. Yellen*, 54 F.4th 325, 337 (6th Cir. 2022). "Conduct is arguably proscribed by a statutory provision if, on 'a plausible interpretation of the statute,' the conduct is forbidden." *Christian Healthcare*, 117 F.4th at 843 (citation omitted).

Again, Michigan's new law prohibits a licensed mental health professional from "engag[ing] in conversion therapy with a minor," MICH. COMP. LAWS § 330.1901a, and "conversion therapy," in turn, is defined as "any practice or treatment by a mental health professional that seeks to change an individual's sexual orientation or gender identity, including, but not limited to, efforts to change behavior or gender expression or to reduce or eliminate sexual or romantic attractions or feelings toward an individual of the same gender," MICH. COMP. LAWS § 330.1100a(20). Michigan excludes from the definition of conversion therapy "counseling that provides assistance to an individual undergoing a gender transition" and "counseling that provides acceptance, support, or understanding of an individual or facilitates an individual's coping, social support, or identity exploration and development, including sexual orientation-neutral intervention to prevent or address unlawful conduct or unsafe sexual practices, as long as the counseling does not seek to change an individual's sexual orientation or gender identity." *Id.*

Here, Plaintiffs allege that they believe that "when a client comes to them and seeks to change her gender identity or gender expression to align with her biological sex, or seeks to change her behavior to refrain from acting on same-sex attraction, it is their ethical and religious duty to

help that client live the life she desires to live" (Compl. ¶ 69).  Plaintiffs allege that they have had clients as young as 10 or 12 years old who said they were "questioning their gender identity and felt like they were someone of the opposite sex" and that Plaintiffs helped their clients "change their behavior and gender expression in ways that better align with the clients' own unique goals for their lives—including by accepting and embracing their biological sex" (*id.* ¶ 6).  McJones specifically related the following treatment that she provided, albeit not to a minor client:

> one female client at Little Flower began seeing me at age 19. I counseled her for roughly two years. She had intrusive thoughts and felt as though she was in the wrong body (i.e., that she should be a male, not female). She sought my services specifically because I am a Catholic counselor, and she did not want these intrusive thoughts to be affirmed. We talked through the origins of those thoughts and worked through comfort with and acceptance of herself and, for example, feminine clothes. Through counseling, she was able to feel more comfortable in her body, reduce her cognitive dissonance around involvement in the Mass, and reported feeling more fully herself.

McJones Decl. ¶ 39.  Plaintiffs allege that they plan to "keep providing the kind of therapy that helps their clients accomplish their goals" (Compl.  ¶ 71), although Plaintiffs also allege that the new law threatens the "destruction" of their businesses (*id.* ¶ 179, quoting *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 535 (1925) (where the owners of private schools were entitled to assert the rights of potential pupils and their parents)).

Defendants opine that Plaintiffs' descriptions of their conduct do not run afoul of Michigan's new law because Plaintiffs consistently emphasize that they "allow clients to lead when setting or maintaining therapy goals" and "stop short of saying they actively seek to change their clients' sexual orientation or gender identity" (ECF No. 27 at PageID.540–542).  However, Plaintiffs argue that there is no carve-out in the statute for a client's "self-chosen goals" because the statute expressly bans "any" counseling that seeks to change an individual's sexual orientation or gender identity or to "reduce or eliminate" sexual or romantic attractions or feelings toward an

16

individual of the same gender (ECF No. 31 at PageID.1047–1050).  The Court agrees that Plaintiffs have described treatment that would arguably violate the law, even if Plaintiffs are unable at this juncture to predict when (or how many) minor clients will come to them for help changing their sexual orientation or gender identity, or the resulting impact on their business.  Plaintiffs' intended conduct is at least arguably prohibited by a plausible interpretation of the statute.[5]

**_Credible Threat of Enforcement._**    The remaining question is whether Plaintiffs have plausibly alleged that there is a "credible threat of enforcement" of the statute against them.  The Sixth Circuit has instructed that "[t]o identify a credible threat of enforcement, the first and most important factor is whether the challenged action chills speech." _Fischer v. Thomas_, 52 F.4th 303, 307 (6th Cir. 2022).  The following additional factors also help inform the analysis of whether a threat of enforcement is sufficiently credible to support a claim for pre-enforcement prospective relief:

> (1) "a history of past enforcement against the plaintiffs or others"; (2) "enforcement warning letters sent to the plaintiffs regarding their specific conduct"; (3) "an attribute of the challenged statute that makes enforcement easier or more likely, such as a provision allowing any member of the public to initiate an enforcement action"; and (4) the "defendant's refusal to disavow enforcement of the challenged statute against a particular plaintiff."

---

[5] As Plaintiffs point out, several other district courts considering pre-enforcement challenges have found standing present on similar allegations about similarly worded laws (Reply, ECF No. 31 at PageID.1052, citing, _e.g._, _Doyle v. Hogan_, Civil Action No. DKC 19-0190, 2019 WL 3500924, at *8–9 (D. Md. Aug. 1, 2019) (Maryland's ban arguably proscribed speech "even when the 'change goal' originates with [the counselor's] minor client"), _rev'd on other grounds,_ 1 F.4th 249 (4th Cir. 2021); _Chiles v. Salazar_, 2022 WL 17770837, at *3–4 (D. Colo. Dec. 19, 2022) (Colorado's ban arguably proscribed "assist[ing] clients with their stated desires … [of] seeking to reduce or eliminate unwanted sexual attractions"), _aff'd_ 116 F.4th 1178, 1197 (10th Cir. 2024); _Otto v. City of Boca Raton_, 353 F. Supp. 3d 1237, 1246 (S.D. Fla. 2019) (Florida's ban arguably proscribed "counsel[ing] minors on their unwanted same sex attractions"), _rev'd on other grounds_, 981 F.3d 854 (11th Cir. 2020); _Vazzo v. City of Tampa_, 2019 WL 1048294, at *4–5 (M.D. Fla. Jan. 30, 2019) (Florida's ban arguably proscribed counseling minor who "desires SOCE [Sexual Orientation Change Efforts] counseling"), R. & R. adopted, 2019 WL 1040855 (M.D. Fla. Mar. 5, 2019)).

*Online Merchs. Guild v. Cameron*, 995 F.3d 540, 550 (6th Cir. 2021) (quoting *McKay v. Federspiel*, 823 F.3d 862, 869 (6th Cir. 2016)).  The *McKay* factors are "not exhaustive, nor must each be established." *Id.*; *see also Fischer*, 52 F.4th at 307 (noting that the *McKay* factors are not "a laundry list").  At bottom, the inquiry distills to whether "surrounding factual circumstances" plausibly suggest a credible fear of enforcement.  *Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021, 1034 (6th Cir. 2022).

Here, Plaintiffs allege that Michigan's new law has chilled the manner in which they interact with their clients (Compl. ¶¶ 122–25).  Specifically, Plaintiffs allege that they are now "guarded" and "cautious" instead of "open" and "candid" in their conversations with clients about sexual orientation and attraction and gender expression (*id.* ¶ 123).  Such caution is not surprising.  Being a state-licensed mental health practitioner is a privilege.  Plaintiffs properly recognize that the potential penalties for engaging in prohibited conduct are "massive" and include fines up to $250,000 and the potential loss of their licenses and livelihoods (Reply Br., ECF No. 31 at PageID.1052); *see also* Compl. ¶¶ 103, 107, 113, & 117.

With regard to the first two *McKay* factors, Plaintiffs do not describe any history of the relevant prosecuting entities enforcing the new law against Plaintiffs or other licensed mental health professionals, including enforcement warning letters.  Defendants similarly indicate that in the more than six months since the statute's effective date, LARA has received no complaints alleging violations of the statute, or generally involving the practice of conversion therapy (ECF No. 27 at PageID.536–537, citing Gumbrecht Decl. [Defs. Ex. 2, ECF No. 27-2] ¶ 23).  LARA has also taken no disciplinary action enforcing the law, nor has it opened any investigations into possible violations of the law (*id.*, citing Gumbrecht Decl. ¶¶ 24–25).  Finally, LARA has not made

any public statements regarding the law nor issued any warnings to Plaintiffs or other licensed mental health professionals relating to the law (*id.*, citing Gumbrecht Decl. ¶¶ 21–22).

However, Plaintiffs point out that Michigan vigorously enforces its license laws, issuing "hundreds or thousands of disciplinary orders each year," including against mental health professionals like Plaintiffs (Compl. ¶¶ 110–14, & 119), a fact that Defendants do not necessarily dispute in their briefing (Resp., ECF No. 27 at PageID.544 (pointing out that Plaintiffs' statistic includes "all health professions ranging from dentistry to veterinary care")).  The Sixth Circuit has also suggested that the *McKay* history-of-enforcement factors may carry less weight where, as here, the challenged law is relatively new, *see Christian Healthcare*, 117 F.4th at 849–50 ("[G]iven the short duration of the ELCRA's application to sexual orientation and gender claims, 'it makes sense that there would be at best limited evidence of a history of enforcement' in those categories") (citation omitted); or where, as also here, the challenged law carries substantial sanctions and "could just as well indicate that speech has already been chilled," *Kareem*, 95 F.4th at 1026 (citation omitted).

Regarding the third *McKay* factor, Plaintiffs accurately point out that the fact that "any person—not just a prosecutor or state agency—may initiate enforcement" is a statutory feature that "'bolster[s]' the credibility of enforcement" of Michigan's new law (ECF No. 31 at PageID.1054, quoting *Platt*, 769 F.3d at 452 (quoting *Driehaus*, 573 U.S. at 164)).  *See also Kareem*, 95 F.4th at 1024 n.2 (noting that in the case of a grievance raised by an individual, the rule in *Platt* required the disciplinary board to independently review the allegations to determine whether they were supported by evidence, upon which the board would launch an investigation).

Last, regarding the fourth *McKay* factor, the Court observes that Defendants did not reference the disavowal factor in briefing, let alone suggest that they will *not* enforce the new law

19

against Plaintiffs.  *See* Resp., ECF No. 27 at PageID.543–545.  Plaintiffs accurately assert that Defendants' refusal to disavow enforcement is strong evidence of a credible threat (ECF No. 31 at PageID.1055).  The Sixth Circuit has found the disavowal factor satisfied where, although government officials had not threatened to enforce a statute against a particular party, "they also have not explicitly disavowed enforcing it in the future." *Green Party of Tenn. v. Hargett*, 791 F.3d 684, 696 (6th Cir. 2015) (citing *Babbitt*, 442 U.S. at 302 (holding that fear of prosecution was not imaginary or speculative where "the State has not disavowed any intention of invoking the criminal penalty provision"); and *Platt*, 769 F.3d at 452 (holding that the plaintiff had standing where the state refused to disavow the enforcement of the statute as applied to the plaintiff)); *see also Universal Life*, 35 F.4th at 1035 (holding that a district attorney had not disavowed enforcement of a criminal law because he never "provided clear assurances" that he would not prosecute the plaintiffs).  These factual circumstances, as pleaded, plausibly suggest a credible fear of enforcement.

In sum, the Court determines that at this pleading stage, Plaintiffs have sufficiently alleged at least a minimal injury arising from their constitutional claims, i.e., a personal stake in the controversy that is concrete.  Thus, the Court concludes that Plaintiffs' Complaint adequately alleges Article III standing sufficient to seek injunctive relief in this case, and the Court proceeds to apply the preliminary-injunction factors to the facts in the record, which the Court finds is adequate for reaching informed, albeit preliminary, conclusions on these claims.

## 2.  Likelihood of Success on the Merits

Pursuant to 42 U.S.C. § 1983, Plaintiffs raise federal questions under the United States Constitution, specifically, the First and Fourteenth Amendments.  *See generally Graham v. Connor*, 490 U.S. 386, 393–94 (1989) (explaining that § 1983 "is not itself a source of substantive

rights" but merely "a method for vindicating federal rights elsewhere conferred"); *Dibrell v. City of Knoxville*, 984 F.3d 1156, 1160 (6th Cir. 2021) (quoting *Graham*, for the same proposition). To establish a likelihood of success on the merits of a claim, a plaintiff must show "more than a mere possibility of success." *Six Clinics Holding Corp., II v. Cafcomp Systems, Inc.*, 119 F.3d 393, 402 (6th Cir. 1997). It is ordinarily sufficient if the plaintiff has "raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *AtriCure, Inc. v. Jian Meng*, 842 F. App'x 974, 982 (6th Cir. 2021) (quoting *Six Clinics, supra*).

### a. Free Speech (Counts I–III)

The Court first examines Plaintiffs' likelihood of success on the merits of their Free Speech claims in Counts I, II, and III. Plaintiffs allege that Michigan's new law violates the Free Speech Clause because the law discriminates based on content and viewpoint (Count I), cannot satisfy strict scrutiny (Count II), and consequently prohibits their minor clients from receiving information (Count III). The location of Michigan's law within a comprehensive system of regulation that governs the practice of mental health care professionals is key and dictates the level of scrutiny that the law must properly withstand. As Defendants point out, "a therapy session is not the town square" (ECF No. 27 at PageID.531).

**Casey, NIFLA, *and* EMW.** The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits laws that abridge the freedom of speech. *See* U.S. CONST. Amend. I. Under Supreme Court precedent, "[i]t has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949). Rather, the Supreme Court has

extended First Amendment protection only to conduct that is "inherently expressive." *Rumsfeld v. FAIR, Inc.*, 547 U.S. 47, 66 (2006). *See, e.g., Expressions Hair Design v. Schneiderman*, 581 U.S. 37, 47 (2017) (explaining that the price regulation's "effect on speech would be only incidental to its primary effect on conduct"). "Numerous examples could be cited of communications that are regulated without offending the First Amendment." *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978).

Pertinent here is the broad power of States to regulate the practice of licensed professionals, *Goldfarb*, 421 U.S. at 792, and specifically the power of States to regulate health care professionals to ensure that their practice complies with relevant standards of care. The Supreme Court long ago observed that "[t]here is perhaps no profession more properly open to such regulation than that which embraces the practitioners of medicine." *Watson v. Maryland*, 218 U.S. 173, 176 (1910). The Supreme Court has reasoned that "[r]eliance must be placed upon the assurance given by his license, issued by an authority competent to judge in that respect, that he possesses the requisite qualifications." *Dent v. West Virginia*, 129 U.S. 114, 122–23 (1889); *see also Collins v. Texas*, 223 U.S. 288, 296–97 (1912) (upholding licensing requirements for osteopaths who required "scientific training" to diagnose patients). The scheme for regulating the practice of health care professionals has also long encompassed the "drugless practitioner" who "does not employ either medicine, drugs, or surgery in his practice" but rather "faith, hope, and the processes of mental suggestion and mental adaptation." *Crane v. Johnson*, 242 U.S. 339, 340 (1917) (upholding California's licensing requirements). *Cf. Powell v. Texas*, 392 U.S. 514, 528 (1968) (including psychotherapy within the scope of "the medical profession"); *Jaffee v. Redmond*, 518 U.S. 1, 15–16 (1996) (rejecting distinctions among licensed social workers, psychiatrists, and psychologists in application of privilege).

The Supreme Court has held that a State's legitimate concern for maintaining high standards of professional conduct extends beyond initial licensing. *Barsky v. Bd. of Regents of Univ.*, 347 U.S. 442, 451 (1954). And the right of a State to regulate the delivery of health care extends even to "medical matters concerning which there is difference of opinion and dispute." *Collins*, 223 U.S. at 297–98. For example, Defendants point to the holding in *Lambert v. Yellowley*, 272 U.S. 581, 587–89 (1926), where a physician sued to enjoin a law that barred him from prescribing liquor for medicinal purposes, contending that this restriction violated his "fundamental rights." The Supreme Court disagreed, holding that Dr. Lambert's "belie[f] that the use of spirituous liquor as a medicinal agent is at times both advisable and necessary" did not override the ability of the government to outlaw it. *Id.* at 596.

The delivery of health care often encompasses speech. In 1992, in *Planned Parenthood of Southeast Pennsylvania v. Casey*, 505 U.S. 833 (1992), overruled on other grounds by *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022), the Supreme Court examined the informed-consent provisions of a Pennsylvania statute that required physicians, among other things, to orally inform patients of the nature of the abortion procedure; its risks and alternatives; the probable gestational age of the unborn life in the patient when the doctors would perform the abortion; and the availability of pamphlets (1) describing unborn life in further detail, including stages of gestational development, (2) listing agencies offering alternatives to abortion, and (3) giving information about obtaining child support from the unborn life's father. *Casey*, 505 U.S. at 881, 902–03. The *Casey* plurality reasoned that "a requirement that a doctor give a woman certain information as part of obtaining her consent to an abortion is, for constitutional purposes, no different from a requirement that a doctor give certain specific information about any medical procedure." *Id.* at 884. Though the joint opinion acknowledged that "the physician's First

Amendment rights not to speak" were implicated by the informed-consent statute, the plurality applied no heightened scrutiny and upheld the statute because a doctor's rights were implicated "only as part of the practice of medicine, subject to reasonable licensing and regulation by the State." *Id.* at 884 (citations omitted).

In 2018, in *National Institute of Family & Life Advocates v. Becerra*, 585 U.S. 755 (2018) ("*NIFLA*"), the Supreme Court examined a California law requiring licensed primary care or specialty clinics to provide a government-drafted script about the availability of state-sponsored services, as well as contact information for how to obtain them.  One of those services was abortion, the practice that the petitioners were devoted to opposing.  *Id.* at 766.  The Supreme Court determined that the licensed notice plainly altered the content of the petitioners' speech by requiring them to inform women how they could obtain state-subsidized abortions.  The Supreme Court held that the Ninth Circuit therefore erred in failing to apply strict scrutiny to the content-based law, rejecting the Ninth Circuit's determination that strict scrutiny was not required because the notice regulated "professional speech."  *Id.* at 766–67.  The Supreme Court emphasized that it had never recognized "professional speech" as a "separate category of speech."  *Id.* at 767–68.

However, the Supreme Court acknowledged that it had afforded "less protection for professional speech in two circumstances—neither of which turned on the fact that professionals were speaking."  First, the Supreme Court acknowledged that in prior cases, it had applied "more deferential review to some laws that require professionals to disclose factual, noncontroversial information in their 'commercial speech.'"  *NIFLA*, 585 U.S. at 768 (citing *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 651 (1985); *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 250 (2010); and *Ohralik*, 436 U.S. at 455–56).  Second, the Supreme Court acknowledged that "under our precedents, States may regulate

24

professional conduct, even though that conduct incidentally involves speech." *Id.* (citing *Ohralik*, 436 U.S. at 456, and *Casey*, 505 U.S. at 884 (Joint opinion of O'Connor, Kennedy, and Souter, JJ.)).  The Supreme Court indicated that "neither line of precedents is implicated here." *Id.*

In 2019, in *EMW Women's Surgical Center, P.S.C. v. Beshear*, 920 F.3d 421 (6th Cir. 2019) the Sixth Circuit recapped the two categories of professional speech the Supreme Court acknowledged receive less constitutional protection: (1) "laws that require professionals to disclose factual, noncontroversial information in their 'commercial speech,'" like advertisements; and (2) the regulation of "professional conduct, even though that conduct incidentally involves speech." *Id.* at 426 (quoting *NIFLA*, 585 U.S. at 768).  The Sixth Circuit held that "*Casey* and *NIFLA* recognize that First Amendment heightened scrutiny does not apply to incidental regulation of professional speech that is part of the practice of medicine." *EMW*, 920 F.3d at 429.  With this backdrop in mind, the Sixth Circuit applied the lower level of scrutiny mandated by *Casey* and *NIFLA* and ultimately held that although Kentucky's Ultrasound Informed Consent Act "requires doctors to disclose certain truthful and non-misleading information relevant to the abortion procedure, it does not violate their First Amendment rights because the required disclosures are incidental to the Commonwealth's regulation of doctors' professional conduct." *Id.* at 430–32.

***Other Circuits.***  Other circuits have also consistently held that regulations of professional conduct fall within the exception to heightened scrutiny described in *Casey* and *NIFLA*.  In 2019, in *Capital Associated Industries, Inc. v. Stein*, 922 F.3d 198 (4th Cir. 2019), the Fourth Circuit recognized that the Supreme Court "disapproved of" the "so-called 'professional speech doctrine'" but held that the law before it, which prohibited the practice of law by corporations, "fits within *NIFLA's* exception for professional regulations" of conduct "that incidentally affect speech." *Id.*

25

In 2020, in *Vizaline, L.L.C. v. Tracy*, 949 F.3d 927, 928–29, 934 (5th Cir. 2020), which involved a First Amendment challenge to state surveyor-licensing requirements, the Fifth Circuit similarly "reiterate[d] *NIFLA's* insistence on the conduct-speech analysis." The Fifth Circuit held that the district court erred by "categorically exempting occupational-licensing requirements from First Amendment scrutiny" and remanded for the district court to determine whether the plaintiff's practice "constitutes speech or conduct." *Id.* at 934.

In *Otto v. City of Boca Raton*, 981 F.3d 854, 859 (11th Cir. 2020), the Eleventh Circuit also recognized that the Supreme Court in *NIFLA* had described two types of speech that receive either less or no protection under the First Amendment: "commercial speech: and "incidental speech swept up in the regulation of professional conduct." *Id.* at 865, 867. Although the Eleventh Circuit ultimately determined that the municipal conversion therapy ordinances before it did not regulate conduct, the Eleventh Circuit agreed that "there is no doubt that 'States may regulate professional conduct,'" *id.* at 865 (quoting *NIFLA*, 585 U.S. at 768), because "words can in some circumstances violate laws directed not against speech but against conduct," *id.* (quoting *R.A.V. v. City of St. Paul*, 505 U.S. 377, 389 (1992)). *See also Del Castillo v. Secretary, Florida Dep't of Health*, 26 F.4th 1214, 1226 (11th Cir. 2022) (applying *NIFLA* and upholding a Florida law requiring licensure of dieticians against a free speech challenge as a regulation of professional conduct, although the dietician's practice involved her oral communication of diet and nutrition advice), *id.* at 1223 ("The *NIFLA* Court spoke with unmistakable clarity about the line of precedents upholding regulations of professional conduct that incidentally burden speech[.]").

In 2022, in *Tingley v. Ferguson*, 47 F.4th 1055 (9th Cir. 2022), the Ninth Circuit held that the Supreme Court had recognized that laws regulating categories of speech belonging to a "long ... tradition" of restriction are subject to lesser scrutiny. *Id.* at 1079 (quoting *NIFLA*, 585 U.S. at

768 (citation omitted)).  The Ninth Circuit held that the conversion therapy ban passed by the Washington legislature, which is worded virtually identically to Michigan's new law, "regulates a category of speech belonging to such a tradition, and it satisfies the lesser scrutiny imposed on such laws." *Id.* at 1078.  The Ninth Circuit determined that the Washington legislature's purpose in enacting the law—"protecting its minors against exposure to serious harms caused by conversion therapy" —was, "[w]ithout a doubt," a legitimate state interest. *Id.*  The Ninth Circuit pointed out that Washington legislators had relied on the fact that "[e]very major medical and mental health organization" uniformly rejected both aversive and non-aversive conversion therapy as unsafe and inefficacious.[6] *Id.*  The Ninth Circuit reasoned that in relying on the body of evidence before it as well as the medical recommendations of expert organizations, the Washington legislature rationally acted by amending its regulatory scheme for licensed health care providers to add "[p]erforming conversion therapy on a patient under age eighteen" to the list of unprofessional conduct for the health professions. *Id.* at 1078–79.

And last, in September 2024, in *Chiles v. Salazar*, 116 F.4th 1178 (10th Cir. 2024), the Tenth Circuit reached similar conclusions in a case filed by a licensed mental health counselor seeking to enjoin Colorado's ban of treating minors with conversion therapy.  The Tenth Circuit recognized that *NIFLA* is the "key precedent." *Id.* at 1201.  Like the other circuits, the Tenth Circuit determined that Colorado's regulation fell within an exception where professional speech

---

[6] The Ninth Circuit previously described aversive treatments as including "inducing nausea, vomiting, or paralysis; providing electric shocks; or having an individual snap an elastic band around the wrist when aroused by same-sex erotic images or thoughts," and the Ninth Circuit described non-aversive treatments as using "assertiveness and affection training with physical and social reinforcement to increase other-sex sexual behaviors" and attempting to "change gay men's and lesbians' thought patterns by reframing desires, redirecting thoughts, or using hypnosis, with the goal of changing sexual arousal, behavior, and orientation." *Pickup v. Brown*, 740 F.3d 1208, 1222 (9th Cir. 2014) (quoting APA, Appropriate Therapeutic Responses to Sexual Orientation 22 (2009)), abrogated by *NIFLA*, 585 U.S. 755 (2018).

receives "less protection" because the regulation targets professional conduct that only incidentally involves speech. *Id.* at 1202 (quoting *NIFLA*, 585 U.S. at 768). The Tenth Circuit, which pointed out that the plaintiff did not dispute that her counseling services fell within the ambit of state regulation, emphasized that "[t]alk therapy is a treatment, not an informal conversation among friends." *Id.* at 1207–08. The Tenth Circuit held that Colorado's statute, which is also virtually identical to Michigan's new law, prohibited "the practice of conversion therapy—not the discussion of the subject by the mental health provider." *Id.* at 1208–09. Indeed, the Tenth Circuit pointed out the Colorado statute rested on the very principle rightfully urged by the dissent in that case, to wit: that the government "cannot restrict any speech uttered by professionals simply by relabeling it conduct." *Id.* at 1209. The Tenth Circuit ultimately had "no trouble" concluding that the Colorado statute was "rationally related to Colorado's interest in protecting minor patients seeking mental health care from obtaining ineffective and harmful therapeutic modalities." *Id.* at 1220.

   ***Rational Basis Review.*** As described in Michigan law, Plaintiffs' conduct as licensed mental health professionals explicitly involves rendering treatment, even if nearly all of their treatment is provided via speaking. *See* MICH. COMP. LAWS § 333.18201(b) ("practice of psychology" includes "treatment of mental or emotional disorders"); § 333.18101 ("practice of counseling" includes "treating mental and emotional disorders"); § 333.18501(1)(g) ("practice of social work at the master's level" includes "treatment of mental, emotional, and behavioral disorders"). Michigan's new law falls within this professional licensing scheme. The language of the law, on its face, concerns treatment and does not target speech. The law provides that licensed mental health professionals shall not "engage in conversion therapy with a minor," with "conversion therapy" defined as a "practice or treatment." Barring a professional from

"engag[ing]" in a specific "practice or treatment" designates the prohibition of a course of conduct. *See, e.g., Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 572 (1991) (Scalia, J., concurring) (finding that, "[o]n its face," a law barring a person from "engag[ing], appear[ing], or fondl[ing]" was "not directed at expression in particular"). Indeed, Michigan's law does not prohibit licensed mental health professionals from speaking with clients about gender identity or sexual orientation, generally, or even conversion therapy, specifically. The law prohibits the administration of conversion treatment.

The challenged law does not fall within a special constitutional category of professional speech; rather, the new addition to Michigan's Mental Health Code is a general law regulating professional conduct, a category of speech belonging to a "long ... tradition" of restriction. A therapist's First Amendment rights are "implicated but only as part of the practice of [her profession], subject to reasonable licensing and regulation by the State[.]" *NIFLA*, 585 U.S. at 789–90 (Breyer, J., dissenting) (internal citation omitted). Under Supreme Court and Sixth Circuit precedent, the law is not subject to heightened First Amendment scrutiny but "traditional rational-basis review." *EMW*, 978 F.3d at 439–40. The law is not subject to any form of heightened scrutiny under the First Amendment because the conduct regulated by the law is not merely "tied to a [medical] procedure," *NIFLA*, 585 U.S. at 770, but consists solely of the administration of the procedure or treatment itself.

Under rational basis review, a law is "presumed to be valid and will be sustained" if it is "rationally related to a legitimate state interest." *Cleburne v. Cleburne Living Ctr. Inc.*, 473 U.S. 432, 440 (1985); *see also Dobbs*, 591 U.S. at 301 (stating that "health and welfare laws" are entitled to a "strong presumption of validity") (quoting *Heller v. Doe*, 509 U.S. 312, 319 (1993)). Under the rational basis test, "legislative choice is not subject to courtroom fact-finding and may

be based on rational speculation unsupported by evidence or empirical data." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993).  The government has "no obligation" to produce evidence supporting the rationality of its actions. *TriHealth, Inc. v. Bd. of Comm'rs, Hamilton Cnty.*, 430 F.3d 783, 790 (6th Cir. 2005).  The "highly deferential" standard is "designed to respect the constitutional prerogatives of democratically accountable legislatures and executives." *Bristol Reg'l Women's Ctr., P.C. v. Slatery*, 7 F.4th 478, 483 (6th Cir. 2021) (quoting *EMW*, 978 F.3d at 438), abrogated on other grounds by *Dobbs*, 597 U.S. 215 (2022).  *See, e.g., Williamson v. Lee Optical of Oklahoma Inc.*, 348 U.S. 483, 488 (1955) ("It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it.") (upholding Oklahoma statute regulating visual care).

Michigan has a legitimate interest in safeguarding the psychological wellbeing of minors. *See New York v. Ferber*, 458 U.S. 747, 757 (1982) ("A democratic society rests, for its continuance, upon the healthy, well-rounded growth of young people into full maturity as citizens.") (quoting *Prince v. Massachusetts*, 321 U.S. 158, 168 (1944)).  Mental health professionals play pivotal roles and hold unique positions of trust and authority with their minor clients.  In passing the new law, Michigan legislators found that treating children with conversion therapy fell below prevailing standards of care, and Michigan legislators targeted the specific and devastating harms to children that result from conversion therapy, including dramatically increased risks of depression and suicide.  The Committee on Health Policy's Subcommittee on Behavioral Health heard testimony from numerous individuals and organizations in support of the bill, including the Michigan Psychological Association, the National Center for Lesbian Rights (NCLR), and the Michigan Association of School Psychologists (MASP) (Defs. Resp., ECF No. 27 at PageID.535–536, citing Committee Meeting Minutes, Mich. H. Comm. on Health Policy

30

Subcomm. on Behavioral Health (June 7, 2023)).  The testimony presented to the Subcommittee discussed at length the scientific research on the ineffectiveness of conversion therapy and its documented harms (*id.*).  When signing bipartisan HB 4616 and 4617, Governor Whitmer noted that "[n]ot only is conversion therapy ineffectual, it can lead to significant long-term harm, including anxiety, depression, internalized homophobia, self-blame, and higher risk of suicide" (*id.* at PageID.536, quoting 7/26/2023 Press Release of Gov. Whitmer).

The Court's preliminary conclusion is that Michigan's law readily satisfies the rational basis requirements.[7]  The Michigan legislature acted rationally when it decided to protect the psychological wellbeing of its minors by preventing state-licensed health care providers from engaging in conversion therapy with them.  Plaintiffs are not likely to establish the Free Speech violations alleged in Counts I through III.

### b.  Free Exercise Clause (Counts IV & V)

The Court turns next to examining Plaintiffs' likelihood of success on the merits of their Free Exercise claim in Counts IV and V (Compl. ¶¶ 161–180).  Plaintiffs allege that they are "engaged in religious exercise when they provide counseling that helps clients accomplish their own personal goals" and that "[b]y prohibiting counseling that would help parents transmit their religious beliefs regarding sex and gender to their children, Defendants have interfered with parents' right to direct the religious upbringing of their children" (*id.* ¶¶ 163, 177).

---

[7] As Defendants point out (ECF No. 27 at PageID.560), Plaintiffs include in their Complaint and throughout their arguments in support of their motion references to the alleged harms of undergoing surgical or medical gender transitions "via puberty blocking drugs, cross-sex hormones, and surgeries."  *See* Compl. ¶¶ 2–4, 74–82; Br., ECF No. 15 at PageID.126, 131–136, 144–146, &  157; and Andrew Clark Decl. [Pls. Ex. D, ECF No. 15-4] ¶¶ 54–64; Reply, ECF No. 31 at PageID.1047.  Michigan's new law bans conversion therapy for minors and does not regulate medical interventions.  Plaintiffs' repeated references to medical intervention are therefore misplaced and not helpful to the Court's analysis.

The First Amendment prohibits laws that abridge the free exercise of religion.  *See* U.S. CONST. Amend. I.  The government must commit "itself to religious tolerance." *Meriwether v. Hartop*, 992 F.3d 492, 512 (6th Cir. 2021) (quoting *Masterpiece Cakeshop, Ltd. v. Colo. Civ. Rights Comm'n*, 584 U.S. 617, 638 (2018) (citation omitted)).  To prevail on a Free Exercise claim, a plaintiff must first demonstrate that the defendant's conduct burdened her religious exercise. *Dahl*, 15 F.4th at 731–32.  Here, Plaintiffs merely allege, in conclusory fashion, that "HB 4616 burdens Plaintiffs' religious exercise" and "treats comparable secular activity more favorably than religious exercise" (Compl. ¶¶ 164 & 168).  Plaintiffs have not identified any particular religious practice that Michigan's new law burdens.

Assuming, for the sake of argument, that Plaintiffs have plausibly demonstrated that Michigan's law burdens the free exercise of religion, a law that burdens religious exercise is presumptively unconstitutional unless it is both neutral and generally applicable.  *Meriwether*, *supra* (citing *Emp't Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 877–78 (1990)).  "[I]f the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral, and it is invalid unless it is justified by a compelling interest and is narrowly tailored to advance that interest."  *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah.*, 508 U.S. 520, 533 (1993).  "To determine the object of a law, [courts] must begin with its text, for the minimum requirement of neutrality is that a law not discriminate on its face.  A law lacks facial neutrality if it refers to a religious practice without a secular meaning discernable from the language or context."  *Id.* (examining ordinances prohibiting animal sacrifice, a practice of the Santeria faith).

Michigan's new law readily passes this test of facial neutrality.  The law prohibits a licensed mental health professional from "engag[ing] in conversion therapy with a minor," MICH.

COMP. LAWS § 330.1901a, and "conversion therapy," in turn, is defined as "any practice or treatment by a mental health professional that seeks to change an individual's sexual orientation or gender identity," MICH. COMP. LAWS § 330.1100a(20).  There is no reference to religion nor any use of words with religious connotations.  Michigan's law prohibits all conversion therapy on minors, regardless of whether the minor's (or the minor's parent's) motivation for seeking such therapy is religious or secular, or some variation.

Facial neutrality is not alone determinative.  *Lukumi*, 508 U.S. at 534.  The Free Exercise Clause forbids even "subtle departures from neutrality."  *Gillette v. United States*, 401 U.S. 437, 452 (1971).  Hence, "courts must look beyond the text and scrutinize the history, context, and application of a challenged law."  *Meriwether*, 992 F.3d at 512 (citing *Masterpiece*, *supra*, and *Lukumi*, *supra*).

Here, Plaintiffs contend that Michigan's law was enacted with "official expressions of hostility to this well-known religious practice" (ECF No. 15 at PageID.156–157).  However, as Defendants point out (ECF No. 27 at PageID.566), the comments Plaintiffs highlight do not necessarily demonstrate hostility to religion, only criticisms of conversion therapy.  For example, the comments quoted by Plaintiffs characterize conversion therapy as "deceitful" and "horrific" (ECF No. 15 at PageID.156–157).  And, as previously noted, there is not yet any history of application or enforcement that would shed light on the neutrality question.  In short, Michigan's new law is facially neutral, and Plaintiffs have not demonstrated that its history, context, or application support a contrary conclusion.

Additionally, the Court's preliminary conclusion is that Michigan's law is generally applicable.  A law is not generally applicable if it "'invite[s]' the government to consider the particular reasons for a person's conduct by providing 'a mechanism for individualized

exemptions[]'" or "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton v. City of Philadelphia*, 593 U.S. 522, 533–34 (2021) (citations omitted).  Michigan's law does not contain a mechanism for seeking individual exemptions and does not prohibit a particular religious practice.  In sum, Plaintiffs are not likely to establish the Free Exercise violation alleged in Counts IV and V.

c.      **Due Process Clause (Count VI)**

Last, the Court turns to the merits of Plaintiffs' claim in Count VI that Michigan's law is void for "vagueness" (Compl. ¶¶ 182–86), albeit only briefly.  *See Expressions Hair Design*, 581 U.S. at 48 ("[A] plaintiff whose speech is clearly proscribed cannot raise a successful vagueness claim.") (citation omitted).

"No State," the Fourteenth Amendment says, shall "deprive any person of life, liberty, or property, without due process of law."  U.S. CONST. amend. XIV, § 1.  "To succeed on a vagueness challenge, a plaintiff must show either that the law (1) 'fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits'; or (2) 'authorizes or even encourages arbitrary and discriminatory enforcement.'"  *Schickel*, 925 F.3d at 878 (upholding a campaign ethics statute) (quoting *Johnson v. United States*, 576 U.S. 591, 595 (2015)).  To survive a vagueness challenge, the contested law need only: (1) "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited"; (2) "provide explicit standards for those who enforce them" to prevent "arbitrary and discriminatory enforcement"; and (3) not "inhibit" First Amendment rights. *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972) (upholding the city's anti-noise ordinance).

The Court's preliminary conclusion is that Michigan's law is not vague.  The law prohibits licensed mental health providers from employing a "practice or treatment" that seeks to "change"

an individual's gender identity or sexual orientation.  While Plaintiffs opine that the definition of "conversion therapy" cannot be applied without "untethered, subjective judgments" (ECF No. 15 at PageID.151, 154), a counselor with "change" as her predetermined treatment goal is the dividing line between exploring issues of sexuality or gender with a minor client and running afoul of Michigan's new law.  Moreover, "[h]ypothetical vagueness is not enough; the statute must be unconstitutionally vague 'as applied to [t]his particular case.'"  *United States v. Kettles*, 970 F.3d 637, 650 (6th Cir. 2020) (citation omitted).  *See also Holder v. Humanitarian L. Project*, 561 U.S. 1, ___; 130 S. Ct. 2705, 2709 (2010) ("[T]he dispositive point is that its terms are clear in their application to plaintiffs' proposed conduct.").  In short, Plaintiffs are not likely to establish the due process violation alleged in Count VI.

### 3.    Remaining Preliminary Injunction Factors

The Court turns to consider the remaining factors in its preliminary-injunction analysis.  In support of the second factor, Plaintiffs primarily rely on their arguments regarding the purported violations of their constitutional rights (ECF No. 15 at PageID.159), which, given this Court's conclusions herein, is not a viable predicate for irreparable harm.  The balancing of equities also weighs against an injunction.  "[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."  *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (quoting *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers)).  Similarly, public interest lies in regulating the practice of state-licensed professionals and protecting the psychological wellbeing of minors.  On balance, the equities weigh against granting Plaintiffs' request to preliminarily enjoin enforcement of MICH. COMP. LAWS § 330.1901a.  Therefore, the Court, in its discretion, denies their motion.

### III.    CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Plaintiffs' claims against Defendant Hertel are DISMISSED for lack of subject matter jurisdiction, and Defendant Hertel is terminated as a defendant in this case.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for a Preliminary Injunction (ECF No. 14) is DENIED.

Dated:  January 28, 2025                    /s/ Jane M. Beckering
                                                JANE M. BECKERING
                                                United States District Judge